509 P.2d 356

**L. W. FLYNN, dba L. W. Flynn Construction Company, Plaintiff and Appellant,**

v.

**W. P. HARLIN CONSTRUCTION COMPANY et al., Defendants and Respondents.**

No. 12855.

Supreme Court of Utah.

April 17, 1973.

3. Ibid.

4. Rogers v. Dist. Unemp. Comp. Bd., 290 A.2d 586, (D.C.App.1972); Townsend v. Bd. of Rev., 27 Utah 2d 94, 493 P.2d 614 (1972).

**329**

Elliott Lee Pratt of Clyde, Mecham & Pratt, Salt Lake City, for defendants-respondents.

CROCKETT, Justice:

L. W. Flynn who had the subcontract for cement work installations in building the Biological Science Building at the University of Utah sued Harlin Construction Co. and Morrin and Son Co., general contractors, alleging that defendants had: (1) wrongfully terminated his subcontract, which (2) caused him to lose the benefits therefrom, and (3) converted certain of his equipment and materials. After five days of trial to a jury of the usual eight members, one of them asked to be excused for personal reasons. Upon stipulation of the parties the juror was excused and the trial continued with seven jurors as permitted by our law.[1] The issues were submitted on special verdicts upon which the jury found in favor of the plaintiff on each of the propositions just stated, and assessed damages of $20,000 on (2) above, and $5,000 on (3) above.

Subsequently, the trial judge revived consideration of defendants' motions for directed verdicts on those issues. He denied the motions and refused to overturn the jury's findings as to (1), the finding of

James A. McIntosh, Salt Lake City, for plaintiff-appellant.

1. See Rule 48 U.R.C.P.; and that parties can waive a jury entirely, or can waive any part thereof; see State v. Heemer, 25 Utah 2d 69, 475 P.2d 1008, citing Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854.

wrongful termination of the subcontract and as to (3), the $5,000 award for conversion of equipment and materials. However, as to (2), the assessment of $20,000 damages for the breach, he granted defendant's motion for a directed verdict, indicating that in his opinion there was insufficient evidence to sustain that finding.

Plaintiff appeals, seeking restoration of the jury's verdict on that issue. Defendant's cross-appeal, asking elimination of the $5,000 damage for conversion of plaintiff's property.

■ The desirability of brevity in the opinions of this court, which are published extensively and expensively, require that the evidence presented in eight days of trial be only in summary; and because the trial court took the issue of concern here from the jury, we survey the evidence in the light favorable to the jury's verdict.[2]

The subcontract by which the plaintiff Flynn undertook to do the cement work in the Biological Science Building was executed on November 16, 1965. Stated in generality, he was to set the forms for the second and third floors and the roof, and to pour and install the cement work for all of the floors of the building, including those above mentioned and the first floor and the basement. Because of certain delays Flynn's work did not get under way until February, 1966. Thereafter there were other delays occasioned by bad weather and other causes, including lack of coordination in sequence of work of subcontractors. But the jury findings indicate that Harlin was not justified in blaming Flynn. Nevertheless, on May 13, 1966, defendants gave Flynn notice that his subcontract was terminated. Flynn left the job, but his workmen continued on, becoming employees of the defendants, and the project progressed to completion, using materials and supplies that had been brought onto the job by Flynn and his crews.

There is no disagreement that the measure of damages for breach of a construction contract which prevents its performance is the amount the contractor would have received for finishing the project, less whatever would have been the reasonable expenses in doing so.[3] The controversy is over two basic issues of fact, the determination of which are essential to the proper application of that rule.

The first is: what portion of the work had been done by May 13 when plaintiff was ousted from the job.

2. Finlayson v. Brady, 121 Utah 204, 240 P.2d 491 (1952); Glenn v. Gibbons & Reed Co., 1 Utah 2d 308, 265 P.2d 1013 (1954); Koer v. Mayfair Markets, 19 Utah 2d 339, 431 P.2d 566 (1967).

3. Flynn v. Schocker Construction Co., 23 Utah 2d 140, 459 P.2d 433 (1969).

The second is: what would have been plaintiff's cost to complete it.

The amount set in the subcontract originally was $86,000; and there were agreed change orders of $2377.44, making a total of $88,377.44. It is not disputed that on the break-off date of May 13 Flynn had expended about $20,000 for materials and about $21,000 for labor costs, a total of about $41,000, thus just under half of the total contract price. Defendants insist that on that date Flynn had completed much less than one-half of the work. Their brief stated:

> Flynn under any concept of the evidence still had two thirds of the forming work yet to do and over half of the pouring work to do.

From this they argue that Flynn having already expended $41,000, it would be necessary for him to expend greatly in excess of the $88,000 contract price to finish the job. Defendants presented evidence that it in fact did cost them more than the contract price to complete it.

As opposed to this the plaintiff points to his own evidence that he had completed substantially one-half of the actual construction and had incurred more than half of the expense. Corroborative of this is the testimony of Austin Scott, who had served as foreman for Flynn, and who stayed on as foreman for defendants. His estimate was about 40 per cent complete on that date. Plaintiff argues that even if Scott's 40 per cent estimate be accepted, there is nevertheless adequate basis in the evidence to support the verdict. He reasons thus: that the $20,000 expended for materials represented practically all that would be needed to complete the job; and that the $21,000 expended for labor was substantially half of the total labor cost that would be required. He avers that a substantial amount of the labor cost represented the expenses of getting all of the materials to the job, and of getting them conditioned and organized for the actual construction, and that with that phase of the work completed, and better plans for coordination and progress of the work, he could have completed the entire job for about the same amount on labor expense, that is, another $21,000, which added to the $41,000 already expended, would make a total of $62,000, which would leave him a net of about $26,000 on the contract.

Plaintiff further suggests that the fact that the defendants may have expended more than the original subcontract called for does not compel the conclusion that the plaintiff Flynn could not have done it for less. Bearing on this is other testimony of the foreman, Austin Scott: That after the defendants took over they hired substantially more personnel, in some instances as many as two or three times as many, as could be efficiently working together in doing the job.

. An important aspect of the dispute as to the amount of the project that had been completed on the break-off date, May 13, appears to focus more specifically upon the extent that Flynn had progressed in his work on the third floor, which would have been somewhere about the middle of the project.

It is helpful on the factual problem just stated to refer to parts of a somewhat extended analysis of the evidence by the trial judge in connection with his ruling on the directed verdict after the trial. With respect to the third floor he stated that he did not think that there was "any evidence of any work having been done [by Flynn] on the third floor . . . [and further] . . . in my opinion, Mr. Flynn is entitled to absolutely no credit in computations for anything done on the third floor." However, the plaintiff rejoins by pointing out from the now transcribed record (of which the trial judge did not then have the benefit) that both the plaintiff and Mr. Austin Scott had testified that substantial work had been done on the third floor; and further, that while Mr. Harlin himself had initially stated that he thought no work had been done on the third floor, after examining some photographs taken on that date, he admitted that some of Flynn's work had been done, but that he had no way of telling exactly how much.

Having an important bearing on both of the critical issues as stated above: the amount of work already done, and the cost of completing the project, is an exhibit referred to as P–93. It consists of figures placed on the board by Mr. Harlin under examination by plaintiff's counsel. When it was offered in evidence defendants' counsel objected on the ground that there was no basis in the evidence for the figures used. After discussion, the objection was overruled and it was received.

It is pertinent to examine the comments the trial judge made regarding that exhibit after the trial when he changed his ruling on the directed verdict:

Now as to the loss of profits that of course is the big question. I think it's readily apparent that the Jury was undoubtedly persuaded by the 32 cents computation which plaintiff's counsel had Mr. Flynn [this was actually Mr. Harlin preparing exhibit P–93] write out for the Jury on the board. In connection with that computation, a profit of $23,000 was alleged. The jury brought in a verdict of $20,000. *That computation is the only basis in the evidence that could possibly support this verdict.* When you began that exhibit Mr. Pratt objected and *I overruled his objection on the basis that Mr. McIntosh made the contention that Austin Scott had testified that 10,000 square feet of the 3rd Floor was completed.* As I say, six years dulls memory and I give Mr. Scott the benefit of the doubt that *his memory*

*is dulled,* because I think the evidence in this case is absolutely convincing beyond the shadow of a doubt that there is no truth to that contention at all.

In blaming Mr. Scott's memory the judge was apparently trying to be charitable. But the essence of what he said was that he did not think that Mr. Scott had told the truth. This cannot be other than an appraisal of the credibility of Mr. Scott's testimony, a prerogative which should belong exclusively for the jury.

This same pattern of thought was continued in the court's further statement:

> . . . *all you have got is a bare general statement by Scott on one side and an overwhelming weight of the evidence on the other side,* is certainly in my opinion reversible error.

The judge also voiced dissatisfaction with another factual premise upon which the computation Exhibit P–93 was based, that is, the plaintiff's estimate that it would cost 32 cents per square foot to complete the cement work. With respect thereto the court said:

> Your 32 cents a square feet came on the exhibit you had Mr. Harlin draw on the sheets of paper that went in as an exhibit. That is the exhibit that Mr. Pratt objected to. That is the exhibit that shows a 32 cents square foot average. *Mr. Flynn even cut it down lower than that and said he could have finished it for 30 cents a square foot.* And I am just compelled to make that decision, gentlemen. I can't see it any other way and I think it would be a manifest injustice to let a Jury's verdict, based upon that sort of erroneous computation, stand. (All emphasis · in the quotes from the record has been added.)

This statement makes it plainly evident that there was the testimony of Flynn as to the cost per square foot used in the computation. Here, again, the credibility was for the jury.

It is of course a problem of serious concern to this court that a conscientious and industrious trial judge, who saw and heard the witnesses, and who appears to have given careful consideration to the evidence, has after the trial arrived at the conclusion that there was not sufficient evidence to support the $20,000 damage award; whereas, the jury, also presumably of conscientious and reasonable men, unanimously arrived at the opposite conclusion; and it is further perplexing that the judge appears to have had a different idea during the trial in admitting the evidence, and in submitting the issue to the jury, than the view he took of that matter after the trial was over. . .

■■ We have no doubt that it is salutary for a trial judge to desire to be actively involved in the trial and to be eager to see that justice is done. Nevertheless,

under our system of justice, it is neither essential nor desirable that the resolution of disputed questions of fact be forced into the exact mold of thought of any particular individual or judge. When a party has so requested, he is entitled to a trial by a jury of his fellow citizens. In order that that right be safeguarded as it should be, it is essential that the jury have the exclusive prerogative of passing upon the credibility of the evidence and of determining the facts.

Therefore, no matter how ardent may be the trial judge's desire to see that justice is done from his own point of view, he has an obligation of judicial restraint: to make allowance for the fact that other reasonable minds might arrive at a different conclusion than his own. This requirement of disciplined objectivity, in letting someone else have their way, and of letting justice be done from someone else's point of view, is one of the most difficult to achieve, and also one of the highest and most desirable of judicial qualities.[4] Yet, unless this principle is applied in practical operation, the right of trial by jury becomes but a delusion. The jury is permitted to go meaninglessly through all of the procedures of the trial and render the verdict, but only on the undisclosed condition that, unless its verdict agrees with the thinking of the trial judge, it will be set aside and held for naught. This case with everything involved therein, including eight days of trial, is a prime example of the futility and frustrations in such procedure. It offers to the plaintiff the hollow satisfaction of vindicating his contention that defendants had wrongfully terminated his contract, but deprives him of any material redress therefor. This is not what was intended by the right of trial by jury.

It has long been established in our law that a court should not take the case from the jury where there is any substantial dispute in the evidence on issues of fact, but can properly do so only when the matter is so plain that there really is no conflict in the evidence upon which reasonable minds could differ.[5] As was said for this court long ago by the greatly respected Justice Frick:

. . . unless the question is free from doubt, the court cannot pass upon it as a matter of law . . . —

. . . if . . . the court is in doubt whether reasonable men, . . . might arrive at different conclusions, then this very doubt determines the

---

4. See statement of Chief Justice Burger in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (June 29, 1972).

5. Rule 51 U.R.C.P.; Campbell v. Los Angeles & S. L. R. Co., 71 Utah 173, 263 P. 495 (1928); Ewan v. Butters, 16 Utah 2d 272, 399 P.2d 210 (1965).

question to be one of fact for the jury and not one of law for the court.[6]

■ It should be plain from what has been said above that there was such a dispute in the evidence here, and that the court was correct in his rulings during the trial: in admitting the evidence, and in submitting the issues to the jury.

■ Plaintiff also seeks reversal of the trial court's refusal to award him attorney's fees to which he claims entitlement by reason of section 14–1–8 U.C.A.:

> In any action brought upon either of the bonds provided herein . . . the prevailing party, upon each separate cause of action, shall recover a reasonable attorney's fee to be taxed as costs.

The purpose of the statutes requiring the bonds referred to on public contracts is to provide the same protection to laborers and materialmen as to those involved in private contracts:[7] and they are subject to the same rules in enforcement. The instant action was not in essence one for the payment of labor and materials as contemplated in those statutes, but rather was an action for damages for breach of contract,[8] and which incidentally also involved a claim count for conversion of equipment and materials. Accordingly, the trial court's refusal to award attorney's fees was justified.

■ Defendant's cross-appeal seeks to overturn the verdict which awarded plaintiff $5,000 damages for conversion of certain of his equipment and materials. We think it sufficient to state that the trial court was correct in observing that there was a basis in the evidence to justify that verdict, and that under those circumstances we do not disturb the jury's verdict nor the trial court's action thereon.

On the basis of what has been said herein, it is our conclusion that the action of the trial court in refusing to overturn the jury's verdicts as to (1) the wrongful termination of the plaintiff's subcontract, and as to (3) the $5,000 verdict for the conversion of plaintiff's material are sustained, but that his setting aside of the award of $20,000 damages is reversed and that verdict should be reinstated and judgment entered accordingly. Costs to plaintiff (appellant).

CALLISTER, C. J., and ELLETT, and TUCKETT, JJ., concur.

HENRIOD, J., concurs in the result.

---

6. Newton v. Oregon Short Line R. Co., 43 Utah 219, 134 P. 567 (1913).

7. See 17 Am.Jur.2d, Contractors' Bonds, Secs. 44, 59.

8. See 119 A.L.R. 1281.