**MEL HARDMAN PRODUCTIONS, INC.,**
**Plaintiff and Respondent,**

v.

**Dick ROBINSON and Adanac Film Productions, Ltd., a corp., Defendants and Appellants,**

v.

**SUNN CLASSIC PICTURES, INC., a corp. and John Does 1 through X, whose true names are unknown, Counterclaim Defendants and Respondents.**

No. 16366.

Supreme Court of Utah.

Dec. 7, 1979.

---

John S. Adams of Gustin, Adams, Kasting & Liapis, Salt Lake City, for defendants and appellants.

Peter W. Billings and Anthony L. Rampton, Salt Lake City, for Mel Hardman Productions.

Robert S. Howell and Wesley G. Howell, Jr., Salt Lake City, for Sunn Classic Pictures.

CROCKETT, Chief Justice:

Plaintiff Mel Hardman Productions, Inc. (hereinafter Productions) sued defendant Dick Robinson and his corporation, Adanac Film Productions, (hereinafter Robinson) for breach of contract for failing to deliver a nature motion picture based on the life of one Grizzly Adams.

Robinson denied that allegation and filed a counterclaim against Schick-Sunn Classic Pictures, Inc. (hereinafter Pictures), a subsidiary of Productions. Robinson alleges that he fully performed the contract, but that after he had delivered his film to Productions, the latter made a movie based upon his idea, his film and his work, which was profitably sold and distributed, and that Productions breached its agreement when it refused to pay him the "residuals" provided for in their agreement.

At the close of the evidence after a five-week jury trial, Productions and Pictures moved for directed verdicts. The trial court took those motions under advisement and submitted written interrogatories to the jury.[1] After almost two days of deliberation, the jury returned its answers to the interrogatories. They were favorable to Robinson's contentions: that he had not committed any material breach of his contract; and that, though he had not completed all of his obligations thereunder, the conduct of Productions constituted a waiver of his failure to do so. Similarly, as to the counterclaim, the jury found that Productions or Pictures, its agent, had used and distributed Robinson's photoplay, as that term was used in the contract.

Both Productions and Pictures then moved for judgment notwithstanding the verdict. The court adopted the jury's finding that Robinson had not materially breached the contract and denied Productions any recovery on its complaint. How-

---

1. Pursuant to Rule 49(a), U.R.C.P.

ever, the court concluded that, since neither Productions nor Pictures distributed any of the actual film which Robinson had produced and delivered to them, he was "not entitled to any residuals or deferred compensation." The court therefore granted the motion for judgment notwithstanding the verdict and ruled that Robinson should also not recover on his counterclaim. He appeals.

On July 24, 1973, Robinson and Productions entered into a Production Agreement whereby Robinson was to produce a "photoplay" sufficient to produce a feature-length motion picture about one "Grizzly Adams," a historical character who was known for his friendliness and association with wild animals. Under the agreement, Robinson was to produce a photoplay "to the sole satisfaction" of Productions "sufficient to produce a motion picture of not less than ninety (90) minutes in duration, filmed on location in the wilds, tentatively entitled 'Grizzly Adams' based on and pursuant to a final story and script to be submitted" by Robinson, and with him playing the main character.

As payment therefor, Robinson was to receive $150,000 in four installments, plus a percentage of Productions' gross receipts from the sale, distribution, or other disposition of the photoplay or Productions' rights therein. The amount he was to receive was subject to deductions provided for in a distribution agreement between Productions and Pictures, and any costs incurred in the distribution, sale, or other disposition of the photoplay not otherwise to be deducted under that agreement.

Robinson began filming in mid-August 1973 and delivered about 20 hours of film to Productions by October 31, 1973. One month later, after it had paid Robinson the $150,000, Productions hired one John Mahon to assemble a preliminary film from the footage that had been submitted by Robinson. After Productions reviewed the film, they allegedly notified Robinson that the result was not satisfactory; and advanced him another $35,000 to complete the motion picture. The position of plaintiffs is that defendant still failed to deliver a satisfactory motion picture; and in April 1974, this action was initiated for the money it had

paid him and for claimed loss of profits because of his alleged breach of the agreement.

On June 10, 1974, Productions employed one Charles Sellier "to salvage the Grizzly Adams project." He reviewed the film that Robinson had submitted and he states that it was his opinion that, due to the deficiencies in the film and Robinson's lack of cooperation, it could not be used; and that he proceeded to produce a different motion picture, entitled "The Life and Times of Grizzly Adams," which contained none of the actual film which had been produced by Robinson. This Sellier version of the story was released in November 1974, and is conceded to be a financial success. It was subsequently distributed to theaters throughout the United States and foreign countries, and shown on television. It was also the basis for a weekly television series which ran for over two years. In July of 1975, Robinson filed his counterclaim for percentages of the proceeds plaintiffs had realized from the distribution of that film. Following extensive discovery procedures and after numerous pre-trial motions and conferences, the case came to trial on January 8, 1979.

The position essayed by Productions and Pictures, both in the trial court and on appeal, is that the intent of the term "photoplay," as used in the agreement, was restricted to the specific motion picture on film (with sound and voice recording) actually produced by Robinson, and to the satisfaction of Productions. Whereas the position taken by the defendant is that the meaning intended was more general, including the aggregate of the name, the general concept of the story, and the literary and work product, which he fashioned into the Grizzly Adams story, all of which he delivered to the plaintiffs and which they made use of.

■ We note our agreement with the thought that it is simply not consistent with principles of justice and fair dealing for one party to impose upon another a requirement that something be done to his satisfaction and then arbitrarily withhold his approval. Equity and good conscience re-

quire that he act in good faith, and prevent him from stubbornly refusing to acknowledge satisfaction without some reasonable justification for doing so.[2]

■ In the course of the trial, the jury heard and saw all of the evidence relating to those issues. This included the viewing of the Sellier version, which was distributed, and a three-hour edited version of the film which Robinson had produced and delivered to the plaintiffs.

The jury was given proper instructions as to the issues involved and the case was submitted to them on special interrogatories. Instruction No. 18 was:

This case will be submitted to you in the form of a *set of questions* to answer *which will resolve the factual issues in this case.* After you have resolved the factual questions, the court will determine how your factual determinations apply to the legal issues involved here.

As has been stated above, the jury answered the interrogatories generally favorable to the defendant, and this included this pivotal question:

Did productions or its agent distribute Robinson's photoplay as that term is used in the contract?

to which the jury answered "Yes.

After the jury had returned its answers to the interrogatories, the trial court gave further consideration to the plaintiff's motion for directed verdict and decided to grant it. In doing so, he stated:

. . . In order for the court to determine whether or not the finding as to the distribution of the "photoplay" can stand the court has to ascertain whether or not the Agreement . . . clearly defines the term. Robinson is only entitled to deferred compensation *if his photoplay was distributed* and box office receipts obtained therefrom . . . .

Paragraph 6 of the Agreement is the only one that attempts to define "photoplay" and it says that it "shall be *deemed to include,* [emphasis added by the trial court] but not limited to, a motion picture production consisting of 16mm Ektra-

chrome professional color reversal stock film complete to the post-production stage produced and/or exhibited with or accompanied by sound and voice recording . . . ." This court concludes and holds that *since neither Productions nor Pictures ever distributed any of the film produced by Robinson,* he is not entitled to any residuals nor deferred compensation.

No matter what other parts of the agreement may include items that may be included in the term "photoplay" this definition requires that *part of it must be the celluloid motion picture* . . . . In so holding this court is fully aware of the rule that this court should accept the jury verdict if there is any evidence to support it. [Citing cases.]

It will be seen that, in so ruling, the trial court decided to disregard the findings of the jury and to rule in favor of the plaintiff on the issues in dispute as a *matter of law.* It is our opinion that the court erred in concluding that defendant Robinson could not recover merely because plaintiffs did not use any of the actual film produced by him.

The agreement provides that the term photoplay "shall be deemed to include, *but not limited to,* a motion picture production consisting of . . . film complete to the post-production stage . . . ." The definition of "photoplay" contained in the contract is an illustrative, but not an all-inclusive one. From a consideration of the circumstances surrounding this contract, and the conduct of the parties with respect thereto, it would not be unreasonable to conclude that the term "photoplay" is not necessarily limited to the actual film produced by Robinson.

The question as to what was intended by the term "photoplay" and whether Productions or Pictures distributed Robinson's photoplay as that term was intended to mean in the contract, was a question which the trial court had originally considered as a question of fact, and submitted to the jury for determination. In that regard, this Court has heretofore stated:

---

2. *Haymore v. Levinson,* 8 Utah 2d 66, 328 P.2d 307 (1958).

It is to be conceded that ordinarily the interpretation of the terms of a document is a question of law for the court, but this is not necessarily true in all situations. Where, as here, it is made to appear that the terms may have a particularized application or meaning and there is room for uncertainty or disagreement . . . it was proper for the trial court to regard this dispute as an issue of fact.[3]

There are numerous parts of the record which are consistent with and support the court's initial treatment of the issue as being one of fact. In a minute entry dated July 1, 1977, in denying Production's motion for summary judgment against Robinson on his counterclaim, the trial court stated:

The court finds that *there is ambiguity in the term "Photoplay"* in that the definition states it includes, "but is not limited to" the 16mm film. *This dispute permeates the whole transaction and leaves large issues of fact to be resolved.*

Similarly, in its pre-trial order of January 3, 1979, the court stated that one of the issues, both as to the complaint and the counterclaim, was what was the meaning of the term "photoplay" which was to be delivered by Robinson, and further:

\* \* \* \* \* \*

(3) Did Productions distribute Robinson's photoplay or any substantial portion thereof *or a substantial similarity thereto.*

[Unless otherwise noted, all emphasis herein added.]

It will be seen from the several statements made by the trial court in connection with his rulings that he had consistently considered that the questions: as to the meanings of "photoplay" as used in the contract, whether Robinson had breached the contract, and whether his photoplay had been used and distributed, were questions of fact for the jury.

As we have numerous times indicated, the right of trial by jury is one which should be carefully safeguarded by the courts, and when a party had demanded such a trial, he is entitled to have the benefit of the jury's findings on issues of fact; and it is not the trial court's prerogative to disregard or nullify them by making findings of his own.[4] Therefore, in ruling on motions which take issues of fact from the jury (this includes both motions for directed verdict and for judgment notwithstanding the verdict), the trial court is obliged to look at the evidence and all reasonable inferences that fairly may be drawn therefrom in the light favorable to the party moved against;[5] and the granting of such a motion is justified only if, in so viewing the evidence, there is no substantial basis therein which would support a verdict in his favor.[6] On appeal, in considering the trial court's granting of such motions, we look at the evidence in the same manner.[7]

In further accord with what has been said above, and the conclusion we have reached, is the statement the trial court made to counsel after the jury had been discharged: that he thought the jury had examined the case very carefully. Moreover, in his judgment on the special verdict, the court recited that the jury "was most cooperative during the course of the trial and by reason of the questions submitted and requests made of the court during deliberations was one of the most conscientious juries this court has observed."

3. *Universal Invest. Co. v. Carpets, Inc.,* 16 Utah 2d 336, 400 P.2d 564, 566 (1965). See also *Timberline Equip. Co. v. St. Paul Fire & Marine Ins. Co.,* 281 Or. 639, 576 P.2d 1244 (1977).

4. *Schow v. Guardtone, Inc.,* 18 Utah 2d 135, 417 P.2d 643 (1966); *First Sec. Bank v. Ezra C. Lundahl, Inc.,* 22 Utah 2d 443, 454 P.2d 886 (1969). See statements in *Uptown Appliance & Radio Co. v. Flint,* 122 Utah 298, 249 P.2d 826 (1952); *Roche v. Zee,* 1 Utah 2d 193, 264 P.2d 855 (1953); *Flynn v. W. P. Harlin Const. Co.,* 29 Utah 2d 327, 509 P.2d 356 (1973).

5. *Koer v. Mayfair Markets,* 19 Utah 2d 339, 431 P.2d 566 (1967); *Anderson v. Gribble,* 30 Utah 2d 68, 513 P.2d 432 (1973); *Winters v. W. S. Hatch Co., Inc.,* Utah, 546 P.2d 603 (1976).

6. *Holland v. Brown,* 15 Utah 2d 422, 394 P.2d 77 (1964); *Schow v. Guardtone, Inc.,* supra, note 4; *Koer v. Mayfair Markets,* supra, note 5.

7. *Winters v. W. S. Hatch Co., Inc.,* supra, note 5; *McCloud v. Baum,* Utah, 569 P.2d 1125 (1977).

On the basis of our discussion herein, it is our conclusion that the trial court was correct in his previously expressed views as to the disputed issues; and also that the evidence justified submitting those disputed issues to the jury. Accordingly, the findings of the jury entitling the defendant to recover on his counterclaim should be reinstated.

In view of our conclusion just stated, the question as to damages to be assessed becomes pertinent. On that subject we make these observations: the parties submitted different calculations as to the amounts of damages. When the matter of damages is in dispute, it is an issue upon which the parties are entitled to a jury trial, the same as on other disputed issues of fact. Consistent with what has been said herein, the case is remanded for a determination as to the damages to be awarded on the defendant's counterclaim. Costs to defendant (appellant).

MAUGHAN, WILKINS, HALL and STEWART, JJ., concur.