761 P.2d 1169
**Michael ROSS, Plaintiff–Respondent,**

v.

**COLEMAN COMPANY, INC.; Coast Catamaran Corporation, a corporation, Defendants–Appellants.**

No. 16295.

Supreme Court of Idaho.

July 27, 1988.

Rehearing Denied Aug. 28, 1988.

Imhoff & Lynch, Boise, for defendants-appellants. James B. Lynch argued.

R. Keith Roark, Hailey, for plaintiff-respondent.

BAKES, Justice.

The defendants, Coleman Co., Inc. (Coleman), and Coast Catamaran Corp. (Coast), appeal from the district court's award of a judgment to plaintiff Michael Ross in spite of a jury verdict in favor of the defendants. On June 22, 1984, respondent Ross and Katherine Sateren were sailing a Hobie Cat

16 sailboat, built by Coast and marketed by Coleman, on Magic Reservoir in Blaine County, Idaho, when the mast of Ross's sailboat contacted a low-slung Idaho Power Company transmission line which crossed an inlet on the reservoir. Sateren was killed outright, and Ross was seriously injured. Ross filed tort actions against Idaho Power; Coast, the manufacturer of the sailboat; Coleman, the parent corporation of Coast; and Does I through X, alleging that their negligence was the proximate cause of the accident. Before trial Idaho Power settled with Ross. Only Coast and Coleman proceeded to trial. The trial lasted one month.

The jury's special verdict specifically found that the Hobie Cat was not defectively designed or manufactured, and was not unreasonably dangerous. The jury also found in favor of the defendants on the issue of punitive damages. The jury further analyzed the conflicting evidence and found that Idaho Power Company was 75% negligent, that plaintiff Michael Ross was 10% negligent, that defendant Coast was 10% negligent in designing the sailboat, and that defendant Coleman was 5% negligent. Because Ross's negligence, as found by the jury, was equal to or greater than either of the defendants' negligence, he was not entitled to recover against either Coast or Coleman under Idaho's comparative negligence statute, I.C. § 6–801.

After the jury returned its verdict, Ross filed several motions. One motion requested, under I.R.C.P. 49(a), that the district court make additional findings in his favor and to enter a judgment in his favor upon selected parts of the special verdict entered by the jury. The district court did make such requested special "factual" findings, concluding that the negligence of both defendants should be "aggregated," i.e., that the negligence of the subsidiary corporation, Coast, should be imputed to the parent corporation, Coleman, thereby creating a situation where Coleman's 5% negligence, "aggregated" by Coast's 10% negligence, was greater than that of Ross. Ross was thereby granted a judgment by the district court against Coleman, computed at 15% of the amount of the $2,662,376.00 injuries which the jury found that he had incurred. The judgment totaled $399,356.40.

Ross additionally moved for an award of attorney fees against the defendants based upon statements made by the defendants' attorney in his closing statement. The district court granted the motion and awarded Ross $100,000 in attorney fees and in excess of $17,000 in costs against Coleman for the alleged misconduct of their defense counsel,[1] relying on I.C. § 12–121, I.R.C.P. 54(d) and 54(e), and I.C. § 7–601.

Ross also moved for a new trial under I.R.C.P. 59(a). Among the reasons stated in Ross's motion were the alleged misconduct in defendants' closing statement and the claim that the damages awarded by the jury were inadequate. The district court did not grant the motion, but rather stated that unless the defendants paid the full amount of the judgment entered by the court, plus costs and attorney fees, as ordered, within 28 days, the plaintiff was given the option to choose a new trial on the issue of liability only.[2] The defendants appealed from this order without paying

---

1. The alleged misconduct consisted of the defense counsel's reference in his closing argument to the fact that Idaho Power Company had settled the case with Ross. The reference purportedly violated an *in limine* order issued by the trial court approximately one month prior to trial. That issue is discussed in Part III, *infra.*

2. The district court's order reads as follows: "The court further finds that the plaintiff was denied the right to a fair trial, and therefore, unless the full amount of the judgment entered herein, plus costs and attorney's fees as the court ordered, is paid to the plaintiff within 28 days from the date of this court's order, plaintiff is granted the right to a new trial on the issue of liability only to be filed within 5 days after the initial 28–day period. In the event the plaintiff does not so elect within the 5–day period the judgment shall become final. In the event the defendants elect to not pay the judgment within that time period, plaintiff elects a new trial, the defendants shall pay for all reasons stated, and further, as a justifiable cost, sanction and penalty, all the attorney's fees and costs hereby awarded to be paid within 15 days following expiration of the initial 28–day period."

within the 28–day period. The plaintiff did not elect to take a new trial.

On appeal, the appellants have raised two issues: (1) that the district court erred in aggregating the negligence, *i.e.*, by imputing and adding the 10% negligence of Coast to the 5% negligence of Coleman, thereby increasing Coleman's negligence to 15%, which was greater than that of Michael Ross's negligence, thus in effect reversing the jury's special verdict; and (2) that the district court erred in awarding attorney fees and costs under I.C. § 12–121, I.R.C.P. 54(d) and (e) and I.C. § 7–601. We conclude that the district court erred in overruling the jury's verdict, imputing Coast's negligence to Coleman, and accordingly we reverse. We also conclude that the district court erred in awarding attorney fees and costs.

## I

### THE TRIAL AND JURY VERDICT

Ross's complaint against Coast and Coleman alleged that the defendants "carelessly and negligently designed, constructed, manufactured, tested, certified, sold and delivered a certain boat known as a 'Hobie Cat 16' ...," which was involved in the accident.

**"That defendants ... had knowledge of the negligent and defective design and manufacture of the Hobie Cat boat and mast by virtue of various notices received by these defendants concerning prior accidents.... Said defect consisted of improper design of the boat and mast such that upon contact with a known danger, to wit, electrical wires of any sort, the electricity would enter the boat and cause grave injury or death to those on board. That defendants having full knowledge of this condition of the boat, failed to correct the condition and failed to supply warnings of the dangers to users of the boat, wholly disregarding the likelihood of serious harm to others, all of which proximately resulted in the electrocution of Katherine Kristin Sateren, a passenger on the boat, and the serious and grave injuries to Michael Ross as herein described."**

The plaintiff's evidence of negligence against the defendant Coast was primarily that Coast negligently designed the Hobie Cat 16 sailboat with a mast and a substantial portion of the boat being made primarily of metal which conducted electricity and which could injure those on board. The major thrust of plaintiff's claim against the defendant Coleman was that Coleman, after acquiring the controlling stock interest in Coast in 1976, became aware of the defects in the boat, nevertheless marketed the boat and did not take the necessary steps to compel its subsidiary, Coast, to redesign the boat.

The major thrust of the defendants Coast and Coleman's evidence was to show that the primary cause of the accident was the negligence of Idaho Power in not elevating its low-hanging power lines, and also the negligence of plaintiff Ross who, knowing that the mast would conduct electricity, nevertheless attempted to sail his boat under the low-hanging power lines at a time when his faculties were impaired from drinking alcohol. The jury, after hearing all of the conflicting evidence, resolved the conflicts in favor of the defendants, returning a verdict which found that the Hobie Cat 16 was not defectively designed; rejected plaintiff's claim to punitive damages; and held that Ross's negligence was greater than Coleman's, and equal to Coast's, thus precluding Ross from obtaining any judgment against either Coast or Coleman.

As a preliminary matter, we must consider whether the jury's findings are supported by substantial competent evidence. If they are, then both the trial court and this Court are bound by the jury's verdict. *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986); *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979). When reviewing a jury verdict the evidence adduced at trial must be construed in a light most favorable to the party who prevailed in the jury's verdict. *Nelson v. Northern Leasing Co.*, 104 Idaho 185, 188, 657 P.2d 482, 485 (1983) ("Here the evidence viewed from the most favorable standpoint in support of the jury's verdict

can be held to demonstrate substantial negligence on the part of the Nelsons."); *Mann v. Gonzales*, 100 Idaho 769, 605 P.2d 947 (1980). Viewing the evidence most favorably to support the jury's verdict, the record demonstrates that in June of 1984 Ross caused his Hobie Cat 16 sailboat, which was designed and manufactured by defendant Coast, to make contact with a power line owned and operated by Idaho Power Company, which was located approximately 26 feet above the water, 14 feet below Idaho Power's 40–foot standard for power lines crossing bodies of water in which sailing boats operate. Idaho Power knew of the substandard line, but took no action to remedy the defect.

There was evidence that Michael Ross had previously sailed into the cove over which the power lines were located, that he had prior knowledge of their existence, and that he had been drinking. A fisherman who observed the boat sail into the cove testified that the boat had stopped for several minutes before he spotted smoke from the accident. Further evidence indicated that the boat had been partially de-rigged (sails had been taken down) and there was expert testimony that from the position of Sateren's body and the position of burn marks on the boat, that neither of the victims had been on the trampoline upon which the crew rides that is strung between the two hulls of the Hobie Cat 16. Furthermore, expert testimony was presented from which a jury could reasonably have inferred that one or both of the passengers debarked and were attempting to push the boat away from the power lines when the accident occurred.[3] Thus, the jury could reasonably have concluded that even after Ross became aware that his mast had become entangled in the power lines, he knowingly and negligently attempted to remove it without having the power in the line deactivated, thus causing his own injuries.

The evidence further demonstrated that at the time of the accident Coast was a wholly owned subsidiary of Coleman. Coleman had bought the stock of Coast in 1976. The Hobie Cat 16 had been designed in 1968 and had been manufactured continually since that time by Coast, many years prior to Coleman's acquiring Coast's stock. After acquiring Coast's stock in 1976, both companies became aware of the danger of the Hobie Cat 16 sailboat contacting electrical power lines. Coast had actively attempted to solve the dangers presented by contact between the Hobie Cat 16's 26–foot aluminum mast and power lines. Warning notices had been sent to owners, and warning labels advising sailors of the extreme hazard presented by the overhead power lines were attached to the mast. Ross had installed a new 26–foot mast on his boat just hours before the accident. At that time, he had removed the warning labels from the mast. Research was being conducted by Coast into attaching a non-conducting "comp tip" to the upper portions of the mast.

Although there was other conflicting evidence, the foregoing was substantial competent evidence to support the jury's verdict that (1) Idaho Power's 75% negligence was the primary cause of the accident, and (2) that Michael Ross's negligence was at least equal to or greater than that of either Coast or Coleman. The jury's findings in the special verdict are supported by substantial competent evidence, and thus they are unassailable. *Quick v. Crane, supra; Nelson v. Northern Leasing Co., supra.*

In Instruction No. 34, the court expressly instructed the jury of the consequences of finding Ross's negligence equal to or greater than that of Coast or Coleman, as pro-

---

**3.** At trial defendants produced evidence intended to demonstrate their theory that the boat stopped against telephone wires and the neutral power line, just short of the active phase line, and that Ross had de-rigged the boat before contact was made between the phase line and the neutral line which caused the electrical shock; that Ross and Sateren got off the boat; that Sateren was attempting to push the boat away from the wires when a gust of wind pushed the boat into the phase line resulting in the extreme electrical shock that caused her death and Ross's injuries. This evidence was based in part on expert testimony regarding how the power line was rigged with circuit breakers which were designed to shut the line down when a foreign object contacted the line.

vided in our decision in *Seppi v. Betty*, 99 Idaho 186, 579 P.2d 683 (1978). The jury was expressly told that by finding Ross 10% negligent, Coast 10% negligent, and Coleman 5% negligent, Ross would recover nothing from either Coast or Coleman. Thus, knowing the consequences of the verdict which they rendered, the jury must have concluded, from "their own lay sense of justice," that the defendants should not have to pay for the plaintiff's injuries. *Seppi v. Betty*, 99 Idaho at 193, 579 P.2d at 690.

The Special Verdict Form, which was given to the jury, required the jury to make several findings regarding the various claims of the plaintiff and the several defenses raised by the defendants. Section 1 of the Special Verdict Form (Questions 1 through 4) dealt with the plaintiff's claim of strict liability in tort. The jury, in response to Question No. 1, determined that the Hobie Cat 16 was not "defectively designed and unreasonably dangerous to person or property," thus eliminating plaintiff's claim based on strict liability in tort.

In another section of the Special Verdict the jury ruled against plaintiff Ross's claim that the defendants' conduct was such as to warrant punitive damages, thus eliminating punitive damages from the case.

4.  "[Special Verdict] SECTION TWO

"Question No. 5: Was the Plaintiff Michael Ross negligent?
   Answer:   Yes __12__   No _____
   . . . .
"Question No. 6: If the answer to Question No. 5 was "yes", was the negligence of Michael Ross a proximate cause of the accident?
   Answer:   Yes __12__   No _____
   . . . .
"Question No. 7: Was the Defendant Coast Catamaran Corporation negligent in connection with the designing of the Hobie 16 sailboat and/or mast?
   Answer:   Yes __12__   No _____
   . . . .
"Question No. 8: If your answer to the foregoing question No. 7 was "yes", was the negligence of Coast Catamaran Corporation a proximate cause of the accident?
   Answer:   Yes __12__   No _____
   . . . .
"Question No. 9: Was the defendant Coleman Company, Inc., negligent?
   Answer:   Yes __12__   No _____

In Section Two of the Special Verdict dealing with negligence and proximate cause, the jury was asked, by individual interrogatories, to evaluate separately the conduct of each actor—Idaho Power, plaintiff Ross, defendant Coast, and defendant Coleman—to determine which if any of those actors were individually guilty of negligence which was a proximate cause of the accident. The jury separately found each actor negligent.[4]

The jury was then asked, in Questions 13 and 14, to evaluate the business relationship of defendants Coast and Coleman jointly to determine if they were jointly, rather than separately, negligent. Question No. 13, which was part of the special verdict form submitted by the plaintiff,[5] was answered as follows:

   "*Question No. 13:* Do you find that Coast Catamaran Corporation and Coleman Company, Inc., under these instructions, are equally at fault by reason of their business relationship which was a proximate cause of the injuries to Michael Ross?
   Answer: Yes _____   No __12__ "

The court then, in the next section of the Special Verdict, by Question No. 14, told the jury that they were to assign percent-

   . . . .
"Question No. 10: If your answer to Question No. 9 was "yes," was the negligence of Coleman Company, Inc., a proximate cause of the accident?
   Answer:   Yes __12__   No _____
   . . . .
"Question No. 11: Was the Idaho Power Company negligent?
   Answer:   Yes __11__   No __1__
   . . . .
"Question No. 12: If your answer to Question No. 11 was "yes", was the negligence of the Idaho Power Company a proximate cause of the accident?
   Answer:   Yes __12__   No _____
   . . . ."

5.  The plaintiff's requested special verdict form is not included in the appeal record. However, the transcript of the jury instruction conference discloses that special verdict questions 13 and 14 were taken from plaintiff's requested special jury verdict form, as orally amended by plaintiff's counsel at the jury instruction conference.

ages of causal negligence to each of the entities for which the jury had determined negligence in the previous Questions 5–13. The jury's findings were as follows:

## "SECTION THREE

"You are now to compare the extent to which the conduct of Michael Ross, Idaho Power Company, Coast Catamaran Corporation, and Coleman Company, Inc., caused the accident.

"*Question No. 14:* We find the parties contributed to the cause of the accident in the following percentages:

| | | |
|---|---|---|
| a. | Michael Ross | 10 % |
| b. | Idaho Power Company | 75 % |
| c. | Unknown or Unnamed party | 0 % |
| d. | By reason · of a "yes" answer to Question No. 13: Coast Catamaran Company, and Coleman Company, Inc. | 0 % |
| e. | By reason of a "no" answer to Question No. 13: (1) Coast Catamaran Company | 10 % |
| | (2) Coleman Company, Inc. | 5 % |
| TOTAL | | 100 % |

. . . .

"*In answering Question No. 14, use subparagraph "d" if you answered "yes" to Question No. 13; but use subparagraph "e" if you answered "no" to Question No. 13.* (Emphasis supplied.) "In answering Question No. 14, the percentages of causation you find attributable to each party, whether you use subparagraphs a, b, c and d; or you use subparagraphs a, b, c and e; must total 100% for all parties."

The foregoing directions at the end of Question 14 were particularly instructive. By those instructions, the jury was told that if they answered "yes" to Question No. 13 [finding Coast and Coleman equally at fault by reason of their business relationship], that Coast's and Coleman's negligence should be determined jointly and not separately. [Parts a, b, c and d must total

100%.] However, if the jury answered "no" to Question No. 13, then the instructions in Question 14 directed that the jury evaluate Coast's and Coleman's negligence separately, not jointly. [Parts a, b, c and e must total 100%.] Thus, by Questions 13 and 14 (which had been submitted by the plaintiff and approved at the instruction conference), the jury was instructed to determine the negligence of Coast and Coleman either jointly, Question 14(d), or separately, Question 14(e), based upon their answers to Question 13, and the directions in Question No. 14. Those directions told the jury that "in answering Question No. 14, the percentages of causation you find attributable to each party, whether you use subparagraphs (a), (b), (c), and (d) [joint liability]; or you use subparagraphs (a), (b), (c) and (e) [separate liability]; must total 100% for all parties."

When the jury rendered its verdict, it unanimously answered Question No. 13 "no" and entered a "0" in Question 14(d), and thus, pursuant to the court's instruction in Question No. 14, found no joint negligence or joint liability on behalf of Coast and Coleman.

## II

## THE DISTRICT COURT'S OVERRULING THE JURY'S VERDICT

Several days after the jury returned its verdict the plaintiff moved pursuant to I.R. C.P. 49(a) to have the district court "aggregate" the negligence of Coast by imputing it to Coleman. The plaintiff argued that the jury had not decided if Coleman was liable for the negligence of its wholly owned subsidiary. After an extended oral argument, the district judge, after admitting that he was "floating in uncharted waters" with regard to his authority to grant the plaintiff's request to "aggregate" Coast's negligence into Coleman's, nevertheless determined that he would rule in favor of the plaintiff on this motion because "it appear[ed] to [him] to be more just than not to aggregate those

amounts." [6] He left it up to the plaintiff to draw up a final order setting out the reasons in the order. The final order drawn by Ross's counsel simply states as a legal conclusion that the parent Coleman is liable for the negligent acts of its subsidiary, without citing any supporting legal authority. It reads as follows:

"1. An issue omitted from the Special Verdict as submitted to the jury and not requested by either party, was the following: *Is. Coleman Company, Inc., the parent corporation of Coast Catamaran Corporation, liable for the negligence of its wholly-owned subsidiary?*
"2. *As a Special Finding, this Court concludes that Coleman Company, Inc., parent company of Coast Catamaran Corporation, a wholly-owned subsidiary, is responsible for the negligence of that subsidiary.* This Finding is based upon the following facts and circumstances.

a. By reason of the joint activities of these companies, and particularly, the activities of Coleman Company, Inc., in either jointly performing, or sharing the duties of, marketing, manufacturing and financing of the product known as the Hobie Cat 16 Sailboat, there exists a common identity with regard to the product, making the parent company responsible by doctrine of respondeat superior, imputed liability or parent company liability;

b. The Court finds that Coleman instituted a policy requiring Product Development Committee meetings every month at Coast; the Committee was responsible for all design changes in Coast's existing products, including the Hobie Cat 16; Coleman exercised some control over the design of the Hobie Cat and received economic benefit from the sale of the boats;

c. The Court further finds that Coleman shared responsibility for marketing activities, financing, control and financing of research and development, advertised the product as a 'Coleman Company product,' and shared various other responsibilities, including those of directorship, leadership and control;

**6.** The transcript clearly demonstrates that the district court judge was unaware of any authority upon which to base his order. The court stated as follows:

"When we're considering the aspect of this case that deals with aggregation, I have to say to myself, 'I feel persuaded that the plaintiff ought to win,' and I was unsure of whether or not there was any authority to do that, and the reason that I feel that the plaintiff ought to win is not because I wish to second guess a jury's decision concerning whether or not the defendants ought to be held negligent, my motivation is simply because *I believe that I collectively found that the defendants were negligent in an amount of 15%....*
....
"Initially, when reading Mr. Lynch's brief, that specific subject, I was reading along and being educated to the fact that Idaho comparative negligence law is considered the individual or Wisconsin rule approach, and that did seem to have some analogous support for his position that then you shouldn't aggregate. But I don't think that that support is that real. I think it's more illusory than real, and that our court—our appellate court could consistently, with the Wisconsin rule, generally, find that when there is a close relationship, and in this case I certainly find that close relationship, that was expressed in the paragraph read

by Mr. Schlender between Coleman and Coast. I don't think there's any doubt about that. *And it appears to me to be more just than not to aggregate those amounts.*
"On the question of authority to do so, I think I'm floating in uncharted waters either direction as far as Idaho law is concerned, and my guess is that I ought to do what I think is right, rather than to try and predict a conservative approach, somehow, by the Idaho Supreme Court. I have no doubt that whether I rule one way or the other, this matter is going to be available for its review, and I don't know why I should do one approach compared to the other. I should do what I feel the facts suggest and compel the court to do, and in this case, I would say that inasmuch as the jury found a ten and five percent split, that considering the connection between these two defendants, why the amount ought to be aggregated, and I will accept that motion of the plaintiffs to make such aggregation and to present that in the verdict along with a—I guess it's a judicial finding that that relationship existed." (Emphasis added.)
Thus, it is evident from the above colloquy that the district court's decision to impute ["aggregate"] Coast's negligence to Coleman was not based upon any particular legal theory or any specific set of evidence produced at trial, but rather was based upon the court's overall feeling as to what was the most just result.

"3. The negligence of Coleman Company, Inc., and Coast Catamaran Corporation is therefore aggregated and Coleman Company, Inc., is responsible for 15% of the negligence which proximately caused Plaintiff's injuries. In accordance with comparative negligence law and the Special Verdict utilized by this Court and the jury, Coleman has responsibility and liability for 15% of the total jury verdict of $2,662,376.00, or the sum of $399,356.40." (Emphasis added.)

The counsel-drafted order imputing Coast's negligence to Coleman was based solely on the parent/subsidiary relationship, described in the order as "imputed liability or parent company liability," without citing any authority for the proposition that a parent corporation is liable for the acts of its subsidiaries. The order imposing this "imputed liability or parent company liability" attempted to justify the holding because Coleman exercised "some control" over the design of the Hobie Cat and received economic benefit from the sale of the boat, and that Coleman shared responsibility for marketing, financing, control, research and development, and advertising the sailboat.

## THE COURT'S SPECIAL VERDICT

■ Before examining whether the "parent company liability" theory, which was the basis of the counsel-drafted order has any legal basis in Idaho law, we must first analyze the court's jury instructions, and the jury instruction conference, to determine if that issue was even raised by the pleadings and the evidence, and, if so, was it covered by the instructions which were given.[7] By the Idaho Constitution, the right to a jury trial is guaranteed. Id. Const. art. 1, § 7. Here the parties expressly requested a jury trial. Accordingly, they were entitled to a jury trial on all fact issues raised in the case. *See State v. Miles*, 43 Idaho 46, 248 P. 442 (1926); *People ex rel. Brown v. Burnham*, 35 Idaho 522, 207 P. 589 (1922); *Shields v. Johnson*,

10 Idaho 476, 79 P. 391 (1904); *Christensen v. Hollingsworth*, 6 Idaho 87, 53 P. 211 (1898).

"[T]he right of trial by jury is one which should be carefully safeguarded by the courts, and when a party had demanded such a trial, he is entitled to have the benefit of the jury's findings on issues of fact; and it is not the trial court's prerogative to disregard or nullify them by making findings of his own." *Mel Hardman Productions, Inc. v. Robinson*, 604 P.2d 913, 917 (Utah 1979).

In overruling the jury's verdict in this case, thus denying the defendants' right to their jury trial and verdict, the district court relied on I.R.C.P. 49(a) which provides that "if ... *the court* omits any issue of fact *raised by the pleadings or by the evidence*, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury." (Emphasis supplied.) This rule was copied from Federal Rule of Civil Procedure 49(a) and must be read in conjunction with I.R.C.P. 15(b) which provides that "[w]hen issues not raised by the pleading are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." With regard to the trial of issues not pleaded, 3 Moore's Federal Practice ¶ 15.13[2] (2d ed. 1987), states:

"The purpose of an amendment to conform to proof is to bring the pleadings in line with the actual issues upon which the case was tried; therefore an amendment after judgment which brings in some entirely extrinsic issue or changes the theory on which the case was actually tried is not permissible, even though there is evidence in the record—introduced as relevant to some other issue—which would support the amendment. This principle is sound, since it cannot be fairly said that there is any implied consent to try an issue if the parties do not squarely recognize it as an issue in the trial."

**7.** The burden of proof in a negligence action rests on the plaintiff. *Harper v. Hoffman*, 95 Idaho 933, 523 P.2d 536 (1974). Before an issue may be properly before the court it must be presented to the trial court by allegations in the pleadings and evidence touching on a particular question. *Miller v. Miller*, 88 Idaho 57, 396 P.2d 476 (1964).

Reading Rules 49(a) and 15(b) together, the apparent meaning is that "if ... the *court* omits any issue of fact *raised by the pleadings* or *by the evidence* [and which were tried by the express or implied consent of the parties] each party waives his right to a trial by jury on the issues so omitted unless before the jury retires he demands its submission to the jury." There are very few federal cases which have considered Rule 49(a). The commentators have stated that it is only the "inadvertent" omission *by the court* to submit issues which were actually raised by the pleadings or tried by the express or implied consent of the parties which justifies a court in making additional findings under Rule 49. 9 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 2507, at p. 504 (1971). There is no authority which holds that a litigant can choose to submit a case to the jury on certain issues, choosing not to submit on others, or overlooking certain issues or theories and then, after losing the case before the jury, ask the trial court to retry the case upon the other issues which it chose not to raise, or through neglect failed to raise. If the rule were otherwise a litigant could, either by choice or lack of preparedness, try a case to the jury on one issue or legal theory and then, after an adverse verdict, request the court to redecide the case on the factual record made based on new research and new issues or legal theories, thus depriving the other party of his constitutional right to a jury trial on those new issues. Our cases have rejected such a practice. *Masters v. State*, 105 Idaho 197, 200, 668 P.2d 73, 76 (1983) ("The parties will be held to the theories upon which a cause was tried."); *Eastern Idaho Loan & Trust Co. v. Blomberg*, 62 Idaho 497, 506, 113 P.2d 406, 410 (1941) ("Where both parties to an action try their case upon the same theory as to the issue tendered by the pleadings, they are bound by the theory so adopted."); *Idaho Gold D. Corp. v. Boise Payette Lbr. Co.*, 52 Idaho 766, 776, 22 P.2d 147, 150 (1933) ("Furthermore, the parties to an action are bound by the theory on which they try it."). Accordingly, we review the record to determine what issues were tried to the jury.

Ross's complaint raised no issue concerning parent-subsidiary liability or, for that matter, joint venture or joint business enterprise liability of any kind. Evidence was offered at trial to prove plaintiff's strict liability, negligence and punitive damages claims against Coast and Coleman. The attempt by plaintiff to prove his strict liability claim against Coast and Coleman required the plaintiff to submit evidence of the design, manufacturing and marketing of the sailboat by one or both of the two corporations. The attempt by plaintiff to prove the sailboat to be "unreasonably" dangerous, both for strict liability purposes and for punitive damages purposes, required plaintiff to examine the interrelationship between the two corporations, regarding their knowledge of the electrical shocking problem and the attempts to remedy it. This evidence, which was admitted in support of plaintiff's strict liability and punitive damages claims, does reflect that Coleman was involved with its subsidiary Coast in marketing, advertising and researching the modification of the aluminum mast, and generally received economic benefit from the marketing of the sailboat. The question which we must first decide is whether, based upon that evidence, the issue of parent company liability, assuming there is such a legal doctrine, was raised by that evidence, since it was not raised by pleadings.

I.R.C.P. 15(b) provides that issues, even though not raised by the pleadings, may be tried by the "express or implied *consent* of the parties." (Emphasis added.) However, consent implies, and minimal due process requires, notice to a litigant of the issues being raised. When issues are not raised by the pleadings, the evidence raising the legal issue must be clear enough so that *both* parties know of the issue and consent to the issue being tried. As this Court said in *M.K. Transport, Inc. v. Grover*, 101 Idaho 345, 349, 612 P.2d 1192, 1196 (1980):

> "The requirement that the unpleaded issues be tried by at least the implied consent of the parties assures that the parties have notice of the issues before

the court and an opportunity to address those issues with evidence and argument. *Cook v. City of Price, Carbon County, Utah,* 566 F.2d 699 (10th Cir.1977); *Cox v. Fremont County Public Building Authority,* 415 F.2d 882 (10th Cir.1969); *Otness v. United States,* 23 F.R.D. 279 (D.Alaska 1959).

" 'Implied consent to the trial of an unpleaded issue is not established merely because evidence relevant to that issue was introduced without objection. At least it must appear that the parties understood the evidence to be aimed at the unpleaded issue.' *MBI Motor Co., Inc. v. Lotus/East, Inc.,* 506 F.2d 709, 711 (6th Cir.1974).

*"Where nothing in the record indicates that an unpleaded issue was litigated at trial, it is error for the trial court to base its decision on the unpleaded issue. See, e.g., Browning Debenture Holders' Committee v. Dasa Corp.,* 560 F.2d 1078 (2d Cir.1977); *MBI Motor Co., Inc. v. Lotus/East, Inc., supra; Freitag v. The Strand of Atlantic City,* 205 F.2d 778 (3d Cir.1953)." (Emphasis added.)

8. **"Rule 51(a)(1). Instructions to jury.—Requests—Objections.—**No later than five (5) days before the commencement of any trial by jury, any party may file written requests that the court instruct the jury on the law as set forth in such request, and such requested instructions must be served upon and received by all parties to the action at least five (5) days before the commencement of the trial. The court shall not be required to consider any requested instructions not filed and served upon the parties as required by this rule, but the court may reasonably permit any party to file and serve written requests for instructions at any time up to and including the close of the evidence at the trial upon the grounds that such requested instructions concern matters arising during the trial of the action which could not reasonably have been anticipated by the party requesting such instructions or were overlooked in the original requested instructions. ...."

9. The plaintiff was separately seeking both compensatory and punitive damages from both corporations. While the pleadings contain no allegation of joint enterprise responsibility, or parent/subsidiary liability, after all of the evidence was in, and the parties gathered for the instruction conference, the plaintiff's discussions of his requested instructions indicated that he was hedging his primary argument of separate liabil-

It is the duty of the party asserting the issues to give that notice, first by the pleadings, then by requesting appropriate jury instructions setting out those issues at least five days before trial. I.R.C.P. 51(a)(1).[8] *Joyce Brothers v. Stanfield,* 33 Idaho 68, 71, 189 P. 1104, 1105 (1920) ("Error cannot be predicated on failure to instruct ... in the absence of a request for such instruction."); *Goodwin v. Wulfenstein,* 107 Idaho 492, 690 P.2d 947 (Ct.App. 1984), *citing Joyce Brothers* with approval.

A review of plaintiff's requested instructions and the dialogue at the instruction conference clearly indicated that by that time Ross's counsel were arguing that Coast's and Coleman's conduct could be evaluated both on a joint liability theory and on a separate basis.[9] Ross's Requested Instructions 10 [10] and 14 [11] were aimed at imputing Coast's negligence to Coleman based in part on the composite business relationship between Coast and Coleman. The plaintiff, after considerable discussion, dropped Plaintiff's Requested Instruction No. 10 in favor of Plaintiff's Instruction No. 14 (which was adopted as Instruction No. 26). That instruction told the jury:

ity of each individual defendant by requested jury instructions that also were directed toward allowing the jury to assess a single negligence percentage for Coast and Coleman jointly.

10. Plaintiff's Requested Instruction No. 10 reads: "Coleman Company, Inc., may be liable for any losses caused by the Hobie Cat 16 if you find that Coleman Company, Inc., participated in the manufacture, marketing and distribution of the Hobie Cat 16, or, Coleman Company, Inc., derived an economic benefit from placing the product in the stream of commerce or was in a position to eliminate the unsafe character of the product."

11. Plaintiff's Requested Instruction No. 14 reads: "You may find Coleman Company liable for a defect in the design of the Hobie 16 Sailboat, provided that you find all of the elements of product defect liability or negligence as required by these Instructions previously given, were proved by Plaintiff, and *if you find that Coleman Company for a profit or other benefit participated in a composite business enterprise with Coast Catamaran Corporation* whereby a consumer demand for a product and a reliance upon the product was created by Coleman Company which placed a defective product in the stream of commerce." (Emphasis added.)

*"You may find Coleman Company liable* for a defect in the design of the Hobie 16 Sailboat, provided that you find all of the elements of product defect liability or negligence as required by these Instructions previously given, were proved by Plaintiff, and *if you find that Coleman Company for a profit or other benefit participated in a composite business enterprise with Coast Catamaran Corporation ....*" (Emphasis added.)

Ross's counsel argued that the plaintiffs had introduced enough evidence during the trial to establish that Coleman was responsible for Coast's failure to correct the electrical conductivity in the Hobie Cat's mast, based primarily on the business relationship that existed between the two companies. Plaintiff's counsel stated,

"Somewhere the jury has to have an instruction [on the joint relationship], and [requested instruction] 14 links in with our special verdict [given Question 13] where we ask them that question: 'Do you find that Coleman is responsible on this basis?' And if they [the jury] say, 'no,' then the defendants had no problem. They've got no worry.

"But they're queried as to whether they do find Coleman responsible on a separate question."

The foregoing statement demonstrates that the plaintiff (and, as the conference goes on, the judge and the defendants) understood that Plaintiff's Requested Instruction No. 14 (which became final Jury Instruction No. 26) was directed toward Coleman's joint liability with Coast because of its "composite business enterprise with Coast Catamaran...." Special Verdict Questions No. 13 and 14 directly asked the jury to decide the factual issue of whether Coast and Coleman were jointly liable or separately liable.

This Court, in *Holland v. Peterson,* 95 Idaho 728, 518 P.2d 1190 (1974), quoting from *Mendenhall v. MacGregor Triangle Co.,* 83 Idaho 145, 149, 358 P.2d 860, 862 (1961), held that where a party fails to request further instructions amplifying the terms of a given instruction, no error may

be predicated on the trial court's failure to fully amplify the instruction further. In this case, it was the plaintiff himself who requested Instruction No. 26 advising the jury that they could find the Coleman Company liable for Coast's defective or negligent design of the sailboat if they find "that the Coleman Company for a profit or other benefit participated in a composite business enterprise with Coast Catamaran...." The plaintiff cannot complain, after the jury has returned its verdict, that that instruction was not adequate to place before the jury any liability which might be imposed upon Coleman as a result of the parent-subsidiary relationship. *Holland v. Peterson, supra; Mendenhall v. MacGregor Triangle Co.,* 83 Idaho 145, 149, 358 P.2d 860, 862 (1961). A party cannot complain of the adequacy or correctness of instructions which it itself has requested the court to give. 75 Am.Jur.2d Trial § 576 (1974), *citing Moeller v. St. Paul City R. Co.,* 16 N.W.2d 289 (1944) (a party requesting a certain instruction cannot afterward complain that such an instruction should not have been given); *see also Papp v. Cantrell,* 96 Idaho 751, 536 P.2d 746 (1975) (holding that where the jury was instructed on damages *in accordance with defendant's requested instructions, the defendant could not subsequently complain* that the damage award was excessive). As stated in *Goldsmith v. Diamond Shamrock Corp.,* 767 F.2d 411, 415–416 (8th Cir.1985):

"In addition, assuming that the district court had the authority to grant the new trial, the exercise of such authority in this case was an abuse of discretion. [Citations omitted.] The instructional error on which the new trial order was based was invited by Diamond through its requested jury instructions, and courts generally find no ground for reversal when the instructions given were consistent with the position of the party seeking relief."

If Instruction No. 26 was inadequate, it was the plaintiff's responsibility to submit an instruction which more specifically set out the legal issues that it was asserting, *Holland v. Peterson, supra,* rather than

wait until after the jury decided the case and then request the court to retry the issue of parent-subsidiary liability. We conclude that any issue of parent-subsidiary liability was subsumed by Instruction No. 26 and Special Verdict Questions 13 and 14, and was answered by the jury in the negative. The trial court erred in concluding that those issues had not been resolved by the jury.

■ However, even assuming that the "parent company liability" issue had not been decided by the jury; and that it was not waived by the plaintiff's failure to submit a more comprehensive and inclusive instruction than the given Instruction No. 26; and that it had been tried by the consent of the parties, express or implied, and that the court had inadvertently failed to instruct the jury on the issue; we neverthe-

less find no legal basis for imposing liability on a parent corporation for the acts of its subsidiary under the circumstances of this case. Our analysis is based primarily upon our own research because the trial court's order set out no legal authorities or analysis for its decision, and the respondent's brief has made little analysis of this issue.[12]

■ First, the Idaho legislature, when it enacted comparative negligence legislation, adopted the "individual rule" which requires that, when comparing percentages of negligence, the negligence of the plaintiff must be compared against each individual defendant in determining whether the plaintiff may recover. I.C. §§ 6–801, 6–802 and 6–803; *Odenwalt v. Zaring*, 102 Idaho 1, 624 P.2d 383 (1980).[13] The statute re-

12. The respondent's brief attempts to support the trial court's action, not upon the "parent company liability" theory, but upon an argument that Coast and Coleman were joint venturers and therefore were jointly liable for the negligence of each other. As earlier pointed out, however, that issue was never raised by the pleadings, and the trial court made no such finding of a joint venture, nor did the trial court make any analysis of the factors necessary to establish a joint venture as set out in our cases of *Easter v. McNabb*, 97 Idaho 180, 541 P.2d 604 (1975), and *Holland v. Peterson*, 95 Idaho 728, 518 P.2d 1190 (1974). Nor did the trial court find Coast and Coleman jointly liable for the plaintiff's damages, as would have been the case had there been a joint venture. Rather, the trial court imposed liability *solely* against Coleman for Coast's negligence on an imputed liability theory, which negates any suggestion that the trial court found a joint venture to exist between the parties. Accordingly, cases like *Krengel v. Midwest Automatic Photo, Inc.*, 295 Minn. 200, 203 N.W.2d 841 (1973), and *Reber v. Hanson*, 260 Wis. 632, 51 N.W.2d 505 (1952), are not in point. In *Krengel*, the trial court found joint venture liability when that issue had not been submitted to the jury. In *Reber*, the jury found joint liability. However, in this case the jury found no joint liability, and the trial court made no finding of joint enterprise liability.

Respondent also argues that *Ogg v. City of Springfield*, 121 Ill.App.3d 25, 76 Ill.Dec. 531, 458 N.E.2d 1331 (Ill.App.Ct.1984), supports the trial court's action in holding Coleman liable for Coast's negligent design of the Hobie Cat sailboat. However, *Ogg* is totally inapposite. *Ogg* was a strict liability products case, not a negligence case. The Illinois appellate court in *Ogg* rejected Coleman's claim that it should not have been held liable because it had not been proved

that it was the manufacturer of the sailboat. The Illinois court held that in a strict liability case for a product found to be defective and unreasonably dangerous, a parent company which participates in the marketing and distribution of that unreasonably dangerous product, and which derives economic benefit from placing it in the stream of commerce, is strictly liable in tort for damages caused by the defective product, even if it was manufactured by its subsidiary, Coast. However, in this case, the jury specifically found that the sailboat in which Ross was injured was not defectively designed or unreasonably dangerous. The jury's answer to Special Interrogatory No. 7 unanimously rejected plaintiff Ross's strict liability in tort claim. Accordingly, the *Ogg* case provides no support for the trial court's action in this case.

13. In *Odenwalt*, this Court held that the legislature, in enacting I.C. § 6–801, rejected the "unit rule" whereby a plaintiff's right to recover is established if the plaintiff's negligence is less than the combined negligence of all defendants. In support of that interpretation of the statute, we stated:

"It would be incongruous to suggest that where there is one defendant and one plaintiff, and both are found to be equally negligent (50%), the plaintiff recovers nothing ... but where there are two defendants and one plaintiff and all three are found to be equally negligent (33⅓%), the plaintiff may recover 66⅔ of his damages from either defendant." *Odenwalt v. Zaring*, 102 Idaho at 5, 624 P.2d at 388.

The Court rejected the "unit rule," recognizing that it would "frequently achieve[ ] a harsh and unjust result." *Odenwalt*, 102 Idaho at 5, 624 P.2d at 388.

quires that a plaintiff prove that a defendant's negligence was greater than that of the plaintiff before a judgment can be rendered against that defendant. *Odenwalt v. Zaring, supra.*

Furthermore, the Constitution and statutes of this state expressly limit the individual or personal liability of a stockholder of a corporation for the obligations of a corporation. Id. Const. art. 11, § 17; I.C. § 30–1–25.[14] Whether the stockholder owns one share or all the shares, the Constitution and statutes have set the policy that no liability inures merely as the result of that stock ownership. The Court of Appeals recently summarized these provisions and this Court's prior decisions in *Baker v. Kulczyk,* 112 Idaho 417, 732 P.2d 386 (Ct.App.1987), stating:

> "In general, a corporate status limits liability. I.C. § 30–1–25. For the court to disregard the corporate entity, two requirements must be met. First, there must 'be such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist....' *Chick v. Tomlinson,* 96 Idaho 483, 485, 531 P.2d 573, 575 (1975) (quoting *Surety Life Ins. Co. v. Rose Chapel Mortuary, Inc.,* 95 Idaho 599, 601, 514 P.2d 594, 596 (1973)). The second requirement is met by a showing that 'if the acts are treated as those of the corporation an inequitable result will follow, ...' *id.,* or that it would 'sanction a fraud or promote injustice.' *Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 917, 591 P.2d 1078, 1084 (1979) (quoting from *Tom Nakamura, Inc. v. G. & G. Produce Co.,* 98 Idaho 183, 457 P.2d 422 (1969))." *Baker v. Kulczyk,* 112 Idaho 417, 419–420, 732 P.2d 386, 388–89 (Ct.App.1987).

Neither requirement is met in this case. Coast was a corporation separately owned and operated by others long before its stock was acquired by Coleman. After Coleman acquired the stock of Coast, both corporations were operated as separate entities, and there is nothing in the record to reflect that "the separate personalities of the corporation[s] and the individual[s] no longer exist." *Baker v. Kulczyk,* 112 Idaho at 420, 732 P.2d at 389. There is nothing in the record to reflect that the corporate structures are a mere sham, with no corporate formalities being followed by the operators, as was the case of *Surety Life Ins. Co. v. Rose Chapel Mortuary, Inc.,* 95 Idaho 599, 514 P.2d 594 (1973). In fact, the record reflects the contrary. The record would not support a finding that Coast was merely the *alter ego* of Coleman.

This case is strikingly similar to *Hassinger v. Tideland Elec. Membership Corp.,* 622 F.Supp. 146 (E.D.N.C.1985). That case was another action brought against Coast Catamaran and Coleman because of another accident in which one of their Hobie Cat sailboats struck a low-hanging power line electrocuting the occupants. The federal district court held as a matter of law that there was not even a triable issue of fact on the plaintiff's claim that the parent corporation Coleman was liable for the acts of its subsidiary Coast. The court decided the case under North Carolina law, which is similar to the law set out in our cases of *Chick v. Tomlinson,* 96 Idaho 483, 531 P.2d 573 (1975), and *Surety Life Ins. Co. v. Rose Chapel Mortuary, Inc.,* 95 Idaho 599, 514 P.2d 594 (1973). The federal court in the *Hassinger* case held:

> "Plaintiffs' evidence is simply insufficient to show that Coast is a corporate phantom which exists as a mere puppet and device of Coleman with respect to the manufacture and design process. North Carolina cases are clear that this

---

14. "[Art. 11] § 17. **Liability of stockholders—Dues.**—Dues from private corporations shall be secured by such means as may be prescribed by law, but in no case shall any stockholder be individually liable in any amount over or above the amount of stock owned by him."

"[**I.C.** §] **30–1–25. Liability of subscribers and shareholders.**—A holder of or subscriber to shares of a corporation shall be under no obligation to the corporation or its creditors with respect to such shares other than the obligation to pay to the corporation the full consideration for which such shares were issued or to be issued."

type of control is required in order to invoke the instrumentality doctrine.

"Secondly, even assuming plaintiffs have presented the requisite demonstration of control by Coleman of Coast, they have failed to present any evidence that such 'control' was used to commit a fraud or wrong or to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act. Even if complete control exists, some additional circumstances of fraud are necessary in order to invoke the instrumentality doctrine. *Ram Textiles, Inc. v. Hillview Mills, Inc.*, 47 N.C.App. 593, 267 S.E.2d 700, 703 (1980); *Huski–Bilt, Inc. v. First Citizens Bank & Co.*, 271 N.C. 662, 157 S.E.2d 352 (1967).

"Accordingly, the court holds that the evidence considered in the light most favorable to plaintiffs does not entitle them to have the jury pass on the instrumentality or alter ego claim and therefore defendant Coleman's motion for summary judgment is GRANTED." 622 F.Supp. at 152.

There is nothing in this record to reflect that Coast was inadequately capitalized and as a result could not respond to a judgment against it. In fact, the record affirmatively shows that Coast has a net worth of several millions of dollars and could respond to any judgment rendered against it.[15] To recognize Coast's corporate structure and not hold Coleman liable for Coast's negligence would not "sanction a fraud or promote injustice." *Tom Nakamura, Inc. v. G. & G. Produce Co.*, 93 Idaho 183, 457 P.2d 422 (1969). Therefore, even if the trial court had been authorized to make post trial special findings concerning the "parent company liability" issue as asserted by the plaintiff Ross, there was absolutely no legal basis in this record for the trial court to impose liability on Coleman for any negligence of Coast.

■ Furthermore, the jury in its answer to Special Interrogatory 7, found that Coast's negligence consisted of "negligen[ce] in connection with the designing of the Hobie Cat 16 sailboat and/or mast." The negligent designing by Coast occurred in 1968, long before Coleman acquired Coast's stock. In no event could Coleman be held liable for the negligence of Coast which occurred prior to the time that Coleman acquired Coast's stock.

"In certain cases the negligence of one person may be imputed to another to charge the latter with liability to a third person injured by reason of such negligence. Generally, where there is an attempt to hold one person civilly liable for the negligence of another, it must be made to appear that the relation of principal and agent or master and servant existed between the two *at the time the tort was committed*, and that the tortious act was committed in the course of employment or within the scope of the agency, or that the person sought to be held responsible was engaged in a joint venture or enterprise with the one who was negligent." 58 Am.Jur.2d *Negligence* § 458 (1971). (Emphasis added.)

■ Finally, it must be pointed out that the trial court's action, in overruling the jury's verdict and "aggregating," *i.e.*, imputing the negligence of Coast to Coleman, was contrary to the court's *Seppi v. Betty* Instruction No. 34, which was given pursuant to the rule announced in our case of *Seppi v. Betty*, 99 Idaho 186, 579 P.2d 683 (1978). In *Seppi*, we held that the trial court should instruct the jury on the consequences of the special findings which they make in their verdict. We stated:

"It would be incredibly naive to believe that jurors, after having listened attentively to testimony of the parties and a parade of witnesses and after having heard the arguments of counsel, will answer questions on a special verdict form without giving any thought to the effect these answers will have on the parties and to whether their answers will effectuate a result in accord with their own lay sense of justice. With respect to most questions, the jury would have to be extremely dull witted not to be able to

---

**15.** Plaintiff proved Coast's and Coleman's net worth as part of its $6,279,960.00 claim for punitive damages, which was based upon 2% of their combined net worth.

guess which answers favor which parties." *Seppi v. Betty,* 99 Idaho 186, 193, 579 P.2d 683, 690 (1978).

As we said in *Seppi,* jurors are as much concerned with the final result which their verdicts will render, as with the specific findings which they make apportioning negligence among the various parties. Accordingly, in *Seppi* we opted in favor of disclosure to the jury of the consequences of their findings and approved the trial courts instructing the juries of the consequences of their verdicts.

The trial court in this case did give a *Seppi v. Betty* instruction. In Instruction No. 34, the court told the jury:

"You are now to compare the negligence of the parties and Idaho Power Company. *If you find the plaintiff's negligence equal to or more than the total amount of negligence of either defendant* or Idaho Power Company, *he will receive nothing from that entity,* regardless of the amount of damages you may find that he sustained. To the extent that you find the plaintiff negligent in an amount less than any of these entities the total amount of damages sustained by him will be reduced by the amount of percentage of negligence you may attribute to him. For example, if you find Michael Ross's negligence was less than Coast Catamaran Corporation, Michael Ross's recovery will be reduced by any percentage of negligence that you may have attached to him. The same analysis applies to Michael Ross and either Coleman Company, Inc., or the Idaho Power Company."

Thus, the jury in this case was told that if they answered Question No. 13 "no," thereby requiring them to evaluate Coast's and Coleman's negligence separately, not jointly, in Special Verdict Question No. 14, and if they "find the plaintiff's negligence equal to or more than the total amount of negligence of either defendant [Coast or Coleman] ..., he [the plaintiff] will receive nothing from that entity."

When the jury answered Question No. 13 "no" and then assessed 10% negligence to plaintiff Ross, and separately assessed only 10% negligence to defendant Coast and 5% to defendant Coleman, the jury understood that under Instruction No. 34, the plaintiff would "receive nothing from [either Coast or Coleman]." Based on *Seppi,* it is apparent that the jury intended by its verdict that the plaintiff Ross collect nothing from the defendants Coast and Coleman. Yet when the trial court imputed the negligence of Coast to Coleman, contrary to the jury's verdict, it rendered the advice given in the *Seppi v. Betty* Instruction No. 34 erroneous. The jury was not accurately told what the consequences of its findings would be, but was erroneously told that, by its verdict, the plaintiff would "receive nothing from" Coast and Coleman, when in fact, as a result of their verdict, and the trial court's "aggregating" action, a judgment of nearly $400,000 was rendered against Coleman. Had the jury been correctly advised in Instruction No. 34 that the trial court intended to impute the negligence of Coast to Coleman, in spite of their finding of no joint negligence in their answers to Special Verdict Questions Nos. 13 and 14, the jury may well have allocated the negligence to Ross, Coast and Coleman in different proportions in order to accomplish their apparent "lay sense of justice" that Ross recover nothing by their verdict.

It is apparent that at the time the trial court gave the jury its *Seppi v. Betty* Instruction No. 34, it had no thought that it would be "aggregating" (imputing) the individual negligence of Coast to Coleman in the event that the jury answered Special Interrogatory No. 13 "no," finding no joint negligence against Coast and Coleman. A review of the trial court's statements after trial, when it made the decision to "aggregate," discloses that the trial judge was basically just substituting his findings of how the negligence should have been apportioned for the findings of the jury.[16]

16. "My old Dean of law school once said that you have to, in a trial court especially, tell the judge why you ought to win and then you ought to—Then you have to tell him how he can help you win.
"*When we're considering the aspect of this case that deals with aggregation, I have to say to*

However, there was substantial evidence to support the jury's findings, and accordingly, the trial court's action, which in effect amounted to a judgment notwithstanding the verdict, is clearly contrary to our case law. *Quick v. Crane, supra; Dinneen v. Finch, supra; Seppi v. Betty, supra.*

In sum, then, the trial court erred when it overrode the jury's factual findings in Special Verdict Questions No. 13 and 14 which held that Coast and Coleman's negligence should be assessed on a separate basis, and that no joint or imputed negligence existed between them because of their "composite business relationship." Accordingly, the judgment entered against Coleman is reversed, and the cause is remanded with directions to enter judgment on the jury's verdict in favor of Coleman and Coast.[17]

## III

### THE SANCTIONS FOR MISCONDUCT BY DEFENSE COUNSEL

One month prior to the beginning of the trial, Ross filed a motion *in limine* to preclude any mention to the jury of a settlement agreement between Ross and Idaho Power Company. The district court orally granted the motion, stating that the settlement agreement could not be men-

tioned without first making an off-the-record offer of proof as to the particular valid need to disclose the agreement. The trial court in orally granting the motion indicated that it would prepare a formal order and serve it upon the parties. However, no such formal order was entered and served by the trial court, as required by I.R.C.P. 16.

At the beginning of the jury selection process, one month later, the district court, in apparent contradiction of its earlier decision to withhold knowledge of the settlement from the jury, advised the entire jury venire that:

> "Defendants in this matter are Coleman Company, Inc., and Coast Catamaran Corporation. Only Coleman Company, Inc., and Coast Catamaran Corporation are defendants at this trial, due to a *settlement agreement reached between Michael Ross and the Idaho Power Company.* The settlement with Idaho Power is not an issue nor to be considered in this case." (emphasis added).

Thereafter, on four other occasions, the district court, in its instructions to the jury, advised them of the settlement agreement reached between Michael Ross and Idaho Power Company.[18] Plaintiff Ross admits

---

*myself, 'I feel persuaded that the plaintiff ought to win,' and I was unsure of whether or not there was any authority to do that,* and the reason that I feel that the plaintiff ought to win is not because I wish to second guess a jury's decision concerning whether or not the defendants ought to be held negligent, *my motivation is simply because I believe that I collectively found that the defendants were negligent in an amount of 15%."*

**17.** Concurrent with the filing of its other motions, the plaintiff filed a motion for a new trial. The district court did not address separately the motion for new trial and the alleged grounds therefor or make any analysis of the motion, as required by our recent case of *Quick v. Crane,* 111 Idaho 759, 727 P.2d 1187 (1986). Rather, after entering judgment against Coleman for $399,356.40, the court merely stated that the plaintiff was denied the right to a fair trial, and unless the defendants pay "the full amount of the judgment entered herein, plus costs and attorney fees as the court ordered, ... within 28 days from the date of this court's order," then the "plaintiff is granted the right to a new trial

on the issue of liability only to be filed within 5 days after the initial 28-day period. In the event the plaintiff does not so elect within the 5-day period the judgment shall become final." *See* n. 2, *infra.* The plaintiff elected to keep its judgment and not accept a new trial. No issue is raised on appeal by either party concerning the propriety of or the effect of the court's alternative new trial order. Accordingly, we do not address it.

**18.** Chronologically, the record shows that the motion *in limine* was filed in August, 1985, and a hearing was held on August 26, 1985. Trial began on September 16, 1985, and on that afternoon the judge told the entire panel of the settlement agreement. The jury was selected by the afternoon of the next day, and the judge once again informed the jury in Instruction No. 1 that Idaho Power was not a party due to the settlement agreement. At the close of the evidence and just before closing statements, the trial court gave further instructions to the jury and, in Instruction No. 21, the district court once again told the jury that Idaho Power had settled with the plaintiff. Finally, after the jury

in his brief that similar "statements [were made] to the jury by plaintiff's counsel regarding the fact of settlement between Idaho Power and Ross," although arguing in the brief that plaintiff's statements "were declaratory rather than argumentative, that is, these statements did not ask the jury to draw any inference about negligence or damage based upon Idaho Power's settlement."

In its argument to the jury the defendants' counsel also referred to the settlement agreement.[19] No contemporaneous objection was made by plaintiff's counsel to counsel's statement, as required by our decision in *Rojas v. Lindsay Mfg. Co.*, 108 Idaho 590, 701 P.2d 210 (1985) (since Rojas' counsel failed to object, move for a mistrial, or seek a cautionary instruction, the issue has not been preserved); *Annau v. Schutte*, 96 Idaho 704, 535 P.2d 1095 (1975). After the case had been submitted to the jury and the jury had been deliberating for nearly a day, Ross's attorneys then requested the court to give a supplemental instruction to the jury regarding the effect of the settlement between Ross and Idaho Power Company. Ross's counsel argued that defense counsel's mention of the settlement agreement was prejudicial, even though he acknowledged that "in the trial, the court made mention a couple of times, or we did, that Idaho Power had settled." After considerable discussion, the court granted the motion and gave Plaintiff's Requested Jury Instruction No. 43, which read:

"You are hereby instructed that under Idaho law, the total amount of the judgment awarded to Michael Ross shall be reduced by that amount, which Idaho Power has heretofore paid to Michael Ross, pursuant to the settlement between Michael Ross and Idaho Power Company."

The jury retired to deliberate, but was immediately recalled to "change the word 'the' to 'any' in the phrase 'the judgment,' so it says 'any judgment'." The altered instruction was then read to the jury again, and they retired for further deliberations.

Sometime thereafter, the jury sent a note to the court stating:

"We don't understand No. 34. Will Idaho Power be subtracted from our dollar amount, and then the percentage difference between Ross and Coast Catamaran Company–Coleman be taken from the difference? Or will Idaho Power be subtracted from our dollar amount and the difference be reduced by the percentage negligence of Ross?"

In response to that request, the court and counsel discussed the matter and agreed that the following additional instruction, No. 44, be given:

"In response to your question: (1) Do not consider the settlement in any manner, for any purpose, when answering the Special Verdict. (2) Instruction 43 was

had retired to deliberate, they sent out a clarification question regarding the Idaho Power settlement, and the trial court submitted Jury Instruction No. 43 and then later Jury Instruction No. 44 in an attempt to clarify the effect of the settlement agreement between Idaho Power and Ross. In other words, during the course of the trial the trial court informed the jury members five different times that a settlement agreement existed between plaintiff Ross and Idaho Power. The settlement agreement was contained in the instructions that were given to the jury and used as part of the jury's deliberations.

**19.** Defendant's counsel first referred to the settlement during closing argument when he was discussing damages. He stated:

"Mr. Ross has settled with the power company and they're suing Coast and Coleman and the message is clear. It isn't compensatory damage that is really the issue. It's either exaggerated compensatory figures, or punitive figures. You can take your choice. As a matter of fact, one of the good tactics lawyers sometimes use is build up this case for punitive damages and then say, 'Okay, but if you don't like that, give them that, but be fair and come back and grab this other punitive figure'. Now, I maintain, simply: If you'll just think about the logic of it, you're looking at two punitive figures. And I think you're going to have to decide, in all honesty and all justice, is my role here to compensate, if you decide that's the thing, or is my role here to engage in punishment of the company?"

Later, when discussing the evidence as it related to the comparative negligence of the various parties, he stated: "The power company has admitted its negligence. They sat up here on this stand and admitted it and they've settled and they're not here."

designed simply to let you know that the court will make any adjustments to your verdict that might be necessary."

After being so instructed, the jury again retired to deliberate and, sometime thereafter, returned its verdict for the defendants.

Four days later, on October 21, 1985, the plaintiff Ross filed three motions: a motion to make additional findings and enter judgment in favor of Ross; a motion for a new trial; a motion for attorney fees and costs, and sanctions. The trial court granted the motion for additional findings and judgment as discussed in Part II herein. The court also gave the plaintiff an option to elect a new trial as an alternative to the $399,356.40 judgment which it had entered in favor of plaintiff, if the plaintiff elected within five days to accept the new trial in lieu of the judgment. The plaintiff elected to keep the judgment and not accept the new trial, as discussed in Part II, *supra*.

Regarding the motion for attorney fees, costs and sanctions, the trial judge orally stated he was granting this motion based on I.C. § 12–121, I.R.C.P. 54(d)(1) and 54(e)(1), and held that the defendants were liable for $100,000 in attorney fees and $17,000 in costs.[20] The trial court stated that the award was based on its finding that defense counsel had failed to conduct settlement negotiations in good faith, and further on the court's "overwhelming belief that the order prohibiting settlement argument was willfully, consciously, and deliberately violated [by defense counsel]."

■■■ We conclude that the district court's award of costs and attorney fees in this case was erroneous for several reasons and, accordingly, we reverse.

1. The district court's imposition of attorney fees was based in substantial part upon its finding that the defense counsel had failed to conduct settlement negotiations in good faith. However, this Court has held that the failure to enter into or conduct settlement negotiations is not a basis for awarding attorney fees under I.C. § 12–121 and I.R.C.P. 54(e)(1). *Payne v.*

*Foley*, 102 Idaho 760, 639 P.2d 1126 (1982). Today, we again make explicit that which we held in *Payne v. Foley, supra*, that "there is no authority in a trial court to insist upon, oversee, or second guess settlement negotiations, if any, and certainly no authority to impose sanctions for 'bad faith' bargaining." *Payne v. Foley, supra* 102 Idaho at 763, 639 P.2d at 1129 (Bistline, J., specially concurring). The district court erred when it imposed costs and attorney fees for failure to engage in good faith settlement negotiations, and accordingly the order must be reversed for that reason.

2. While trial courts have discretion in determining whether or not settlement agreements between some of the parties will be disclosed to the jury, *Quick v. Crane, supra*, once the trial court determines to permit the disclosure, and in fact instructs the jury (in this case several times) regarding the settlement agreement, both parties are ordinarily entitled to refer to the court's instructions in their arguments to the jury. It would be an unusual case, requiring a very specific showing, in order to justify a trial court prohibiting the litigants from mentioning the court's instructions in their closing argument to the jury. After deciding to instruct and advise the jury of the settlement agreement between Ross and Idaho Power, the trial court made no statement that the instruction was not to be mentioned in closing argument, nor did he state any reason at that time why it should not be referred to.

Plaintiff's counsel himself referred to their settlement with Idaho Power in his jury argument with no criticism from the court. It would certainly raise equal protection problems to permit one party to refer to the settlement agreement, but deny the other party that same right. Plaintiff's claim that defense counsel had violated the *in limine* order, when they themselves had violated it, troubled the trial court. He stated,

"Whether or not the violation of that [by Mr. Lynch] adds up to requiring the

20. Counsel for plaintiff was requested to prepare the order. The counsel-drafted order included, for the first time, reference to I.C. § 7–601, which will be discussed, *infra*.

sanctions that Mr. Schlender talks about, is something that is a little harder for me to deal with. I think Mr. Lynch does point out in a way that is more clear to me now than it was when I was listening to it [closing argument], how Mr. Roark's final argument was a long way from faithful adherence to the fact and was as inappropriate in many ways as a lot of the ideas that Mr. Lynch presents. I don't know what the court should do about that."

A review of the hearing on the motion *in limine* conducted a month before the trial commenced discloses that the main purpose for the plaintiff's motion *in limine* was to prevent the fact of the settlement agreement from being brought to the attention of the jury. At the hearing on the motion for sanctions, plaintiff's counsel stated that he was aware of our then recent case of *Rojas v. Lindsay Mfg. Co.*, 108 Idaho 590, 701 P.2d 210 (1985), which required counsel to make a contemporaneous objection to the mention of a settlement agreement in final argument or the objection was waived. He was concerned about the rule in *Rojas* which he stated required the plaintiff to stand up and object at the time, observing that, by objecting, he thereby draws more attention to the settlement agreement. He stated, "Now, you can't unring the bell as far as counsel's statement is concerned. The jury at that point knows there is a settlement agreement, and the only thing counsel for the plaintiff can do is emphasize to the jury the existence and importance of a settlement agreement." However, in this case it was not the defendant, but the trial court itself which "rang the bell" and instructed the jury several times on separate occasions regarding the settlement agreement with

Idaho Power. Plaintiff's counsel also referred to the settlement agreement. The bell having been rung both by the trial court in its instructions and the plaintiff in his argument to the jury, the trial court could not "unring the bell" by penalizing the defendants for doing that which both the court and the plaintiff had previously done. The plaintiff, having done so, can hardly complain of the defendants' reference to the same settlement agreement.

We can only assume that when the trial court made the decision to instruct the jury regarding the settlement agreement it, in effect, withdrew its oral order entered on the motion *in limine*. The fact that the district court failed to finalize the order in written form and serve it upon the parties, as he stated he would do, and as required by the rules, I.R.C.P. 16(c),[21] further supports that conclusion and further deprives the order of the vitality which it might otherwise have had for purposes of imposing sanctions, as will be discussed *infra*.

Finally, if there was any error in either side referring to the Idaho Power settlement agreement during the trial or the final argument, that error was ameliorated by the giving of supplemental Instructions Nos. 43 and 44. By Supplemental Instruction No. 43, which the plaintiff requested, the court advised the jury that "the total amount of any judgment awarded to Michael Ross shall be reduced by the amount of the Idaho Power settlement." Then subsequently, in response to the jury's specific question, the court advised the jury, in Instruction No. 44, "not to consider the settlement in any manner, for any purpose, when answering the special verdict." The court advised the jury that it "will make any adjustments to your verdict that might be necessary" as the result of the settle-

21. The version of I.R.C.P. 16(c) in effect at the time of this trial was rescinded by this Court and replaced by the current I.R.C.P. 16(f). Both the present and the previous rule are substantially the same. I.R.C.P. 16(c) stated:

"**Rule 16(c). Pre-trial order.**—After the pre-trial conference or the filing of a pre-trial stipulation, the court shall enter a pre-trial order pursuant to Rule 16(a) in generally the form described in Rule 16(b)(6). The court shall forthwith cause copies of the signed pre-

trial order to be served on all parties or their attorneys of record in the action."

The present version, I.R.C.P. 16(f), reads:

"**Rule 16(f). Pre-trial order.**—After the pre-trial conference or the filing of a pre-trial stipulation, the court shall enter a final pre-trial order pursuant to Rule 16(d) in generally the form described in Rule 16(e)(6). The court shall forthwith cause copies of the signed pre-trial order to be served on all parties or their attorneys of record in the action."

ment agreement. These two special instructions, which were given after the jury had been deliberating for a day, and which were segregated from the other instructions and were specially called to the jury's attention—one at the express request of the jury—were sufficient to remove the taint of any violation of the court's oral *in limine* order by either party, assuming that that order still had any vitality considering all the events which occurred subsequent to the court rendering its oral *in limine* order.

■ 3. The trial court's order stated that it was granting the award of attorney fees pursuant to I.C. § 12–121 and I.R.C.P. 54(e)(1), and I.C. § 7–601.[22] Assuming that the *in limine* order still had viability, and assuming that it had only been violated by the defendants, none of those authorities authorizes the trial court to award $100,000 in attorney fees under these circumstances. First, I.C. § 12–121[23] provides that the trial court may award attorney fees to the "prevailing party." The defendants Coast and Coleman were the prevailing parties in the jury trial and, accordingly, no award of attorney fees could be made against them under I.C. § 12–121. Secondly, even if a litigant is a prevailing party under I.C. § 12–121, I.R.C.P. 54(e)(1) limits the award of attorney fees to those cases in which the court "finds from the facts presented to it that *the case was* brought, pursued or *defended* frivolously or without foundation. . . ." (Emphasis added.) The award of attorney fees under I.R.C.P. 54(e)(1) and I.C. § 12–121 is directed to those defenses which are not supported by any factual evidence in the record. *See Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 591 P.2d 1078 (1979). Here, not only was there substantial evidence to support the defense, the defendants prevailed. Accord-

ingly, the case was not defended frivously or unreasonably, and thus no award of attorney fees could be assessed under I.C. § 12–121 and I.R.C.P. 54(e) against the defendants.

■ Attorney misconduct can be a basis for the imposition of sanctions under I.C. § 7–601 *et seq.*, which was referred to in the trial court's written order. I.C. § 7–601 defines contempts and states that "[t]he following acts or omissions in respect to a court of justice, or proceedings therein, are contempts of the authority of the court: . . . (5) Disobedience of any lawful judgment, order or process of the court." Assuming, *arguendo*, that the district court's order granting the motion *in limine* had been disobeyed by either counsel in this case, they could have been cited for contempt under I.C. § 7–601. However, a contempt proceeding under I.C. § 7–601 *et seq.* is a special proceeding, criminal in nature, because a violation thereof is punishable by fine or imprisonment. I.C. § 7–610; *Bandelin v. Quinlan*, 94 Idaho 858, 499 P.2d 557 (1972). Because of the criminal nature of such a contempt proceeding, our cases hold that a person charged with contempt under I.C. § 7–601 is entitled to certain procedural due process protections before the court can impose sanctions. He is entitled to notice of the exact charges against him, proof that he had knowledge of the terms of the court's order he was alleged to have violated, notice of the sanctions which might be imposed against him (fine or jail term), and a trial or hearing on the charges raised. *Bandelin v. Quinlan, supra.* While those proceedings may be more summary in cases where the contempt was committed in the presence of the court, rather than outside the presence of the court, I.C. § 7–603, the proceeding is nevertheless

---

22. "7–601. **Contempts defined.**—The following acts or omissions in respect to a court of justice, or proceedings therein, are contempts of the authority of the court:

. . . .

"(5) Disobedience of any lawful judgment, order or process of the court."

23. "12–121. **Attorney's fees.**—In any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties, provided that this section shall not alter, repeal or amend any statute which otherwise provides for the award of attorney's fees. The term 'party' or 'parties' is defined to include any person, partnership, corporation, association, private organization, the state of Idaho or political subdivision thereof."

criminal in nature and minimal due process requirements must be met. In this case, much of the procedural due process was lacking. In particular, plaintiff's motion for attorney fees, costs and sanctions was based on I.C. § 12–121 and Rule 54(e), with no reference to I.C. § 7–601. At no time during the proceedings was defense counsel advised that he was being charged with criminal contempt under I.C. § 7–601, or the nature of those proceedings. The trial court's oral order granting attorney fees and costs only mentioned Rule 54(e), asserting that defense counsel's tactics constituted "frivolity or unreasonable defense." It was only in the final order drafted by plaintiff's counsel that I.C. § 7–601 was even mentioned. That is particularly significant given the fact that the alleged contemptuous conduct was against counsel, but the criminal sanctions were imposed, not against the counsel, but against the two defendants Coast and Coleman.

Even if the procedural due process required by our cases had been rendered, the question then becomes whether or not the trial court abused its discretion in imposing sanctions. As previously discussed, the purpose of the court's oral *in limine* order was to prevent the settlement agreement from being called to the jury's attention. However, the court itself, subsequent to the *in limine* order, instructed the jury several times on the settlement agreement, and it was also mentioned by the plaintiff's counsel. Even though there was no contemporaneous objection to the defense counsel's statement, a day later when it was called to the court's attention the jury was specifically instructed not to consider the settlement agreement in arriving at its determination of negligence and causation pursuant to the special verdict. The trial court made conflicting statements on whether or not, in its opinion, the defense counsel's comments had any effect on the trial. While his final order, prepared by counsel, finds prejudice to the plaintiff, the court's statements at the time of the hearing suggest otherwise. He stated:

"But Mr. Lynch also makes some very good points about, when you bother to have a new trial, and that you have to look not only at individual errors and faults, but would a new trial produce a different result, and is the result at all supported by the evidence, and those questions, I think, are much more difficult to deal with, and I'm going to read both briefs especially the plaintiff's final brief with a little more care. ... I'm not inclined to grant a new trial for the reasons that I've indicated, although I haven't thought it through entirely. So I'll have to wait on that. I think it was urged that I take that part under advisement for a while."

Finally, I.C. § 7–610 limits any sanction or penalty for contempt under I.C. § 7–601 to a fine of $500 or 5 days in jail. The court's action in imposing $100,000 attorney fees and $17,000 costs as sanctions against the defendants exceeded his statutory authority under I.C. § 7–610 by $116,500.00.

For all the reasons set out above, we conclude that the trial court erred egregiously in imposing sanctions against the defendants in this matter, and the order awarding $100,000 attorney fees and $17,-000 costs is set aside.

## IV

## CONCLUSION

The verdict of the jury in this case was supported by substantial competent evidence. The trial court erred when it ignored the jury's finding that no "joint enterprise" existed between Coast and Coleman and entered findings and a judgment in favor of Ross against Coleman. The trial court's imposition of attorney fees on Coast and Coleman pursuant to I.R.C.P. 54(e)(1) and I.C. § 7–601 was erroneous and an abuse of discretion under the specific facts of this case.

The judgment of the trial court is reversed, and the cause is remanded with directions to enter judgment for the defendants on the jury's verdict. Costs to appellants. No attorney fees.

SHEPARD, C.J., and JOHNSON, J., concur.

HUNTLEY, Justice, dissenting.

I must respectfully disagree with the majority's analysis and disposition of this case.

One the principal issue, whether the trial court correctly aggregated the negligence of Coast and Coleman, I would prefer either one of two positions to that taken by the majority.

(1) I would overrule *Odenwalt v. Zaring*, 102 Idaho 1, 624 P.2d 383 (1980) wherein this Court adopted the "individual rule" and adopt the "unit rule" or "combined comparison of negligence" approach; or

(2) I would reverse and remand for new trial because the deficiencies in the instructions rendered them totally confusing that a fair trial and valid verdict was impossible. On the award of sanctions, for improper argument of counsel, I would affirm in concept but reverse for appropriate fixing of damages.

## I

## THE FACTS

Since the majority opinion is somewhat selective in the factual background it presents, I restate them.

Coleman Company, Inc. (Coleman) and its wholly-owned subsidiary, Coast Catamaran Corporation, (Coast) appeal the trial court's award of judgment against them premised upon the trial court's entry of a special finding pursuant to I.R.C.P. 49(a) that their negligence be aggregated by virtue of their status as joint venturers. Coleman and Coast also appeal the trial court's award of attorney fees to Michael Ross as a sanction for defense counsel's violation of an order in limine and alleged failure to conduct settlement negotiations in good faith.

The underlying facts and procedural history of this case are as follows: On June 22, 1984, Michael Ross and Kathryn Sateren were sailing in a Hobie Cat sailboat at Magic Reservoir in Blaine County. As they sailed toward shore, the metal mast of the boat struck an Idaho Power power line. Ross suffered electrical burns requiring the later amputation of both legs below the knee, and Kathryn Sateren was electrocuted.

Michael Ross filed suit against Coleman Company, Inc. and its wholly-owned subsidiary, Coast Catamaran Corporation, which designed and manufactured the boat, as well as Idaho Power Company, which had been responsible for the placement of power lines. The evidence presented at trial centered on the availability and feasibility of manufacturing a plastic, nonconducting "comptip," designed to be inserted at the top of the metal mast to prevent accidents of the kind which occurred in the instant case. Evidence was also presented showing that forty-nine similar accidents, resulting in forty deaths and forty-four severe injuries, had occurred in recent years.

The evidence further showed that, in response to these accidents, Coast and Coleman began searching for solutions to the problems of contact between Hobie Cat masts and power lines in 1978, two years after Coleman purchased Coast. Coast and Coleman worked in concert to find a solution. Specifically, an engineer from the O'Brien Company (another wholly-owned subsidiary of Coleman), Jerry Pollard, moved from O'Brien to Coast to work on the comptip in 1982. Pollard continued to confer regarding the potential for development and manufacture of the comptip with an O'Brien engineer, Bob Eller, until 1984, when O'Brien was able to manufacture the first comptips for the Hobie Cat masts.

Testimony was given regarding the relationship between Coleman and Coast. Coast's president, Ian Douglas Campbell, stated:

Coast Catamaran Corporation is a wholly-own (sic) subsidiary of the Coleman Company. Coleman sets up its overall corporate operations by having separate divisions of subsidiaries. We're known as the Hobie Division within the Coleman Company.

Each of these divisions is given a great deal of autonomy by the corporation to run our own business for the specialized markets that we work in.

The president of Coleman Company, Larry Jones shed further light on the relation-

ship between Coleman and Coast as he testified regarding the authority Coleman possessed over the comptip development project:

> We owned all of the stock of Coast Catamaran by that time. We could have done anything that we felt to be that we wanted.
>
> Q. So you could have called Doug Campbell, [the president of Coast Catamaran] said this is Larry Jones, and I don't want you to produce any more of those Hobie 16's until we get this problem solved with the mast.
>
> A. I think that would have been going a little too far to me, but I certainly could have initiated that and sought the approval of Mr. Coleman and the board of directors and so instructed, and did not, that is correct.

Coleman Company brochures which listed the Hobie Cat as one of many "Coleman Company products" were also admitted into evidence.

Additional to the evidence centering on the relationship between Coast and Coleman was evidence showing that the power lines Ross hit were only twenty-six feet above the water, fourteen feet below the forty foot standard adopted by the Idaho Power Company in 1977. The low lying lines were discovered by an Idaho Power engineer in 1978, but were neither reported nor relocated. Prior to trial, Idaho Power settled with Michael Ross.

Ross filed a motion in limine to preclude any mention of the settlement with Idaho Power before the jury. Judge Bruce granted the motion, ruling that defense counsel could not mention the settlement agreement without first making an off-the-record offer of proof as to a particular, valid need to disclose the agreement. However, during his closing argument, defense counsel mentioned the settlement agreement between Ross and Idaho Power in the following words: "Mr. Ross has settled with the power company and they are suing Coast and Coleman and the message is clear, it isn't compensatory damage that is really the issue, it is either exaggerated compensatory figures or punitive figures...." "The power company has ad-

mitted its negligence. They sat up here on this stand and admitted it and they've settled and they're not here." "Yes, there was negligence on the part of the power company, and yes, there was causation, and it was 100% of the causation. That would be a logical result in this case...." Defense counsel further alluded to the prospect of "two punitive figures" and a possible "windfall" award to plaintiff.

The jury returned a verdict assessing 75% negligence to Idaho Power, 10% to Michael Ross, 10% to Coast Catamaran Corporation and 5% to Coleman Company, Inc. The jury also assessed Ross's damages suffered at $2,662,376. Ross then moved for a new trial, or alternatively, for judgment in his favor and against defendants by way of aggregation of the 10% and 5% negligence of Coast and Coleman respectively, and further moved for an award of attorney fees against defendants.

The trial court made a special finding that Coast and Coleman were joint venturers engaged in a composite business enterprise and, therefore, aggregated the negligence of the two companies, awarding Ross $399,356.40 (15% of the jury's finding of damage). The trial court also granted Ross's motion to award costs and attorney fees due to its "overwhelming belief that the order prohibiting settlement argument was willfully, consciously, and deliberately violated [by defense counsel]" and due to its finding that defense counsel had failed to conduct settlement negotiations in good faith. Attorney fees in the amount of $100,000 were imposed as sanctions pursuant to I.C. § 7–601(5). Additionally, costs as a matter of right in the sum of $17,-743.17, as well as discretionary costs in the amount of $25,000 were awarded to Ross. At issue on appeal is the propriety of the aggregation of negligence of Coast and Coleman and of the sanctions awarded against defendants for the alleged misconduct by defense counsel.

## II

### THE AGGREGATION OF NEGLIGENCE

I would affirm the trial court's aggregation of the negligence of the two party

defendants, Coast and Coleman, and adopt the "unit rule" or "combined comparison of negligence" approach when comparing the plaintiff's negligence to that of the defendants under Idaho's comparative negligence system. In so doing, I would overrule that portion of our opinion in *Odenwalt v. Zaring*, 102 Idaho 1, 624 P.2d 383 (1980), where we adopted the "individual rule" requiring that, when comparing percentages of negligence, the negligence of the plaintiff must be compared against each individual defendant in determining whether the plaintiff may recover.[1]

In *Odenwalt*, we stated our rationale for adopting the "individual rule" as being, in part, to comport with Wisconsin's interpretation of its identical comparative negligence statute and, in part, because of our perception that the unit rule "frequently achieves a harsh and unjust result." *Id.* 102 Idaho at 5, 624 P.2d 383. Specifically, we cited the following example:

> It would be incongruous to suggest that where there is one defendant and one plaintiff, and both are found to be equally negligent (50%), the plaintiff recovers nothing; but where there are two defendants and one plaintiff, and all three are found to be equally negligent (33⅓%), the plaintiff may recover 66⅔% of his damages from either defendant.

102 Idaho at 5, 624 P.2d 383.

This hypothetical posited in *Odenwalt* reflects not just consternation with the "unit rule," but more specifically reflects a profound and fundamental disagreement with the entire concept of joint and several liability. The "unit rule" generally limits a defendant's liability to his proportionate negligent causation of plaintiff's total damage. It is only when one defendant is insolvent that any "harshness" or "injustice" to another defendant might ensue.[2] In that case, another defendant may be called upon to assume the obligation of the other. It is not the "unit rule" which mandates such a result, but the age-old concept of joint and several liability. As the Pennsylvania Supreme Court has stated:

> Any unfairness that results when a tortfeasor cannot be made to pay his proportionate share of the damages is a product of the joint and several liability doctrine. It does not result from applying the "combined comparison" [unit] rule.

*Elder v. Orluck*, 511 Pa. 402, 515 A.2d 517, 525 (1986).

Finally, given that instances where one defendant is forced to pay disproportionately are remote, it seems more "harsh and unjust" to deny recovery to many plaintiffs who, unfortunately, are injured by more than one defendant. Indeed, the commentators routinely favor the "unit rule" or "combined comparison/aggregate" approach, "on the ground that plaintiff's chance of recovery is not jeopardized by the fact that several tortfeasors happen to be involved." V. Schwartz Comparative Negligence 2nd Edition, § 16.6, p. 271. See

---

1. I realize that such a holding will only have short-term effect, absent legislative action, as the 1987 session of the Idaho Legislature amended I.C. § 6–803 to specifically require comparison on an individual basis in negligence cases tried after the effective date of that new statute, July 1987. I.C. § 6–803(3) now reads:

   (3) The common law doctrine of joint and several liability is hereby limited to causes of action listed in subsections (5), (6) and (7) of this section. In any action in which the trier of fact attributes the percentage of negligence or comparative responsibility to persons listed on a special verdict, the court shall enter a separate judgment against each party whose negligence or comparative responsibility exceeds the negligence or comparative responsibility attributed to the person recovering. The negligence or comparative responsibility of each such party is to be compared individually to the negligence or comparative responsibility of the person recov-

   ering. Judgment against each such party shall be entered in an amount equal to each party's proportionate share of the total damages awarded.

   The instant case, as well as all others tried prior to July 1987, is not affected by this "tort reform" legislation.

2. Indeed, even the remote injustices which can be caused by the applicability of the joint and several liability doctrine in states where the "unit rule" is used can be precluded as has been done in Texas, pursuant to Tex.Rev.Civ.Stat. Ann. article 2212(a), § 2(b) which requires that a plaintiff's negligence is compared with the total negligence of all the defendants, but where a defendant's negligence is less than plaintiff's, such a defendant can only be held liable for that portion of the award attributable to his own negligence.

also, Prosser, Comparative Negligence, 51 Mich.L.Rev. 465, 507 (1953). See, *Marier v. Memorial Rescue Service, Inc.,* 296 Minn. 242, 207 N.W.2d 706 (Minn.1973), wherein defendant driver of a highway department truck directed the defendant driver of an ambulance to turn left, whereupon the ambulance collided with plaintiff. The jury found all three parties thirty-three-and-one-third percent negligent and, under the individual rule, the court held that plaintiff had no right to recover. Because there were two defendants, rather than one, a plaintiff whose negligence was less than fifty percent of the cause of his own damage was denied a recovery in tort.

For the above reasons, a substantial majority of states have, either through statute or case law, adopted the unit rule. See, *Walton v. Tull,* 234 Ark. 882, 356 S.W.2d 20 (1962), Ark.Stat.Ann. § 27–1765; *Mountain Mobile Mix, Inc. v. Gifford,* 660 P.2d 883 (Colo.1983); Conn.Gen.Stat.Ann. § 52–572h; Del.Code Ann. tit. 10, § 8132; Hawaii Rev.Stat. § 663–31(a), *Wong v. Hawaiian Scenic Tours, Ltd.,* 64 Hawaii 401, 642 P.2d 930 (1982); Ind.Code § 34–4–33–4; Iowa Code, § 668.3(1); Kans.Stat.Ann. § 60–258a(a); *Prince v. Leesona Corp., Inc.,* 720 F.2d 1166 (10th Cir.1983) (applying Kansas law); *Negley v. Massey Ferguson, Inc.,* 229 Kan. 465, 625 P.2d 472 (1981); Mass.Gen.Laws Ann. ch. 231, § 85; Nev.Rev.Stat. § 41.141(1); *Hurley v. Public Service Co.,* 123 N.H. 750, 465 A.2d 1217 (1983); N.J.Stat.Ann. § 2A: 15–5.1; Ohio Rev.Code Ann. § 2315.19 A(1); Okla. Stat.Ann. tit. 23, § 13; *Laubach v. Morgan,* 588 P.2d 1071 (Okla.1978); Oregon Rev.Stat. § 18.470; Pa.Stat.Ann. tit. 42, § 7102; *Elder v. Orluck,* 511 Pa. 402, 515 A.2d 517 (1986); *Jensen v. Intermountain Health Care, Inc.,* 679 P.2d 903 (Utah 1984); Vt.Stat.Ann. tit. 12, § 1036; *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879 (1979); *North v. Bunday,* 735 P.2d 270 (Mont.1987).

The most recent state to adopt the "unit" or "combined comparison" rule, Montana, did so in *North v. Bunday,* 735 P.2d 270 (Mont.1987). The court considered several factors, including interpretation of its comparative negligence statutes, the policy of the state in comparative negligence cases and the concept of fundamental fairness. Specifically, the court in *North* noted language in its negligence statute which provides that "contributory negligence shall not bar recovery in an action ... if such negligence was not greater than the negligence of the person against whom recovery is sought...." M.C.A. § 27–1–702. The court then noted M.C.A. § 1–2–105 which provides: "The following rules apply in this code: ... (3) The singular includes the plural and the plural the singular." The *North* court then cited to *Mountain Mobile Mix, Inc. v. Gifford,* 660 P.2d 883 (Colo. 1983) to reach its determination that the wording of its negligence statute did not compel the use of the "individual rule." "If the general assembly truly intended the phrase "the person" to exclude the plural, then it could have unambiguously provided for that result by using the phrase "each individual person." 660 P.2d at 886. See also, *Jensen v. Intermountain Health Care, Inc.,* 679 P.2d 903, 908 (Utah 1984). Finally, having concluded that the "individual rule" was not statutorily mandated, the *North* court found the "unit rule" more in keeping with the standard purposes behind legislative enactment of a comparative negligence system (i.e., to ameliorate the harshness of the system of contributory negligence) as well as more in keeping with fundamental notions of fairness.

In his dissenting opinion in *Odenwalt,* Justice Bistline employed a similar approach in analyzing the Idaho legislature's intent in enacting our comparative negligence system. Idaho Code § 6–801, as it read prior to 1987, was substantially similar to M.C.A. § 27–1–702. Additionally, Idaho has a provision identical to M.C.A. § 1–2–105, mandating that "unless otherwise defined for purposes of a specific statute ... a singular number includes the plural and the plural the singular...." I.C. § 73–114.[3] Because our analysis in

---

**3.** The majority in *Odenwalt* paid lip-service to this mode of statutory interpretation by merely acknowledging the existence of I.C. § 73–114 in its footnote 5, but stating that it was not a rule

*Odenwalt* misperceived the "unit rule" as incongruous, because the "unit rule" is, in fact, a less harsh and more just method of applying our comparative negligence laws and furthers the intent behind enacting such a system, and because the "unit rule" more closely fulfills our statutory scheme (prior to July 1987), I would now adopt the "unit rule."

Accordingly, as defendants' negligence, taken together, is greater than plaintiff's, they are jointly and severally liable for the amount of damage they caused. Specifically, Coast is liable for 10% of the total damage award, or $266,237.60, and Coleman is liable for 5% of the total damage award, or $133,118.80.

## III

### ALTERNATIVE POSITION ON AGGREGATION ISSUE

My alternative position would be to approve in concept the trial court's having aggregated the negligence of the two defendant, but I would reverse and remand for new trial for the reasons which follow.

As a complement to our comparative negligence system, Idaho has adopted Wisconsin's "individual rule" requiring that, when comparing percentages of negligence, the negligence of plaintiff must be compared against each individual defendant in determining whether the plaintiff may recover. We adopted the "individual rule" in *Odenwalt v. Zaring,* 102 Idaho 1, 624 P.2d 383 (1980), wherein we noted that Idaho had adopted its comparative negligence statute, I.C. § 6-801, from Wisconsin (Wis.Stat. § 895.045) in 1971. "Therefore, in the absence of some other legislation which would clearly suggest a different result, [footnote omitted] we should follow the interpretation which the Wisconsin Supreme Court had placed upon their compa-

rative negligence statute prior to 1971." *Odenwalt,* 102 Idaho at 5, 624 P.2d at 388. The majority in *Odenwalt* in adopting the "individual rule" rejected the "unit rule," whereby a plaintiff's right to recover is established if the plaintiff's negligence is less than the combined negligence of all defendants. In rejecting the "unit rule," [4] we noted that

> "[i]t would be incongruous to suggest that where there is one defendant and one plaintiff, and both are found to be equally negligent (50%), the plaintiff recovers nothing; but where there are two defendants and one plaintiff, and all three are found to be equally negligent (33½%), the plaintiff may recover 66⅔% of his damages from either defendant."

*Odenwalt,* 102 Idaho at 5, 624 P.2d at 387.

We also noted that such incongruity "frequently achieves a harsh and unjust result." *Odenwalt,* 102 Idaho at 5, 64 P.2d at 388. In short, we both adopted the case law of Wisconsin prior to 1971 and adhered to our own concept of fairness. (See also, *Leliefeld v. Panorama Contractors, Inc.,* 111 Idaho 897, 728 P.2d 1306 (1986).)

We must, then, look to pre-1971 Wisconsin law, and the logical extensions therefrom, to ascertain the boundaries of our case law concerning comparison and aggregation of negligence. *Reber v. Hanson,* 260 Wis. 632, 51 N.W.2d 505 (1972), sets the framework for our analysis. In *Reber,* the negligence of each parent was attributed to both so as to deny their cause of action against one defendant for harm to their child, relying upon the special relationship between, and special and joint duties of, parents. *Dombeck v. Chicago Milwaukee St. Paul and Pacific Railroad Companies,* 24 Wis.2d 420, 129 N.W.2d 185

---

of general application and applied only when necessary to carry out the obvious intent of the legislature.

**4.** It should be noted that the "individual rule" now appears to run counter to the weight of both case authority and scholarly opinion in favor of the "unit rule," with aggregation of defendants' negligence occurring regardless of

special relationship between the defendants. *See, North v. Bunday,* 735 P.2d 270 (Mont.1987); *Elder v. Orluck,* 511 Pa. 402, 515 A.2d 517 (Pa. 1986); *Mountain Mobile Mix, Inc. v. Gifford,* 660 P.2d 883 (Colo.1983); *Wong v. Hawaiian Scenic Tours, Ltd.,* 64 Haw. 401, 642 P.2d 930 (1982). See also, 4 F. Harper, F. James & O. Gray, § 22.16, p. 404 (2d ed. 1986).

(1964) succinctly stated the rule in Wisconsin subsequent to *Reber:*

> "[T]he negligence of one of two joint venturers is imputed to the other in actions against third persons ..." *Dombeck,* 129 N.W.2d at 194.

It is clear, then, that pre–1971 Wisconsin case law required the imputation or aggregation of negligence in actions against third persons provided there existed a special relationship so as to trigger liability. Therefore, we must determine whether Coast, as a wholly-owned subsidiary of Coleman, and Coleman itself, were engaged in such a special relationship.

### PARENT LIABILITY FOR TORTS OF WHOLLY–OWNED SUBSIDIARIES

Liability of a parent for actions of a wholly-owned subsidiary in respect to a third entity can occur regardless of whether the subsidiary's separate corporateness is recognized. Where corporateness is recognized, agency principles apply upon which parent liability may be premised. *Weisser v. Mursam Shoe Corp.,* 127 F.2d 344, 348, n. 11 (2d Cir.1942).

> Where one corporation is under the domination of another, the separate corporate entities or personalities might be recognized, treating the latter as principal and the former as agent, thus making the acts of the latter in effect the acts of the former. Henn and Alexander, *Laws of Corporations,* Ch. 7 § 148, p. 356 (3d.ed. 1983).

In Idaho, we have not had occasion to disregard the corporate entity of a subsidiary corporation, but have recognized that corporate identity may be disregarded where an individual had such a unity of interest and ownership that separate personalities of the corporation and individual no longer exist and where, if the acts at issue are treated as those of a corporation, an inequitable result would ensue. *Chick v. Tomlinson,* 96 Idaho 483, 531 P.2d 573 (1975); *Surety Life Ins. Co. v. Rose Chapel Mortuary, Inc.,* 95 Idaho 599, 514 P.2d

594 (1973). Factors which influence whether the corporate veil will be pierced (and a subsidiary deemed an "alter ego" of the parent) include the obvious under-capitalization of the subsidiary; the failure of either the parent or subsidiary to adhere to corporate formalities; and the formation of the subsidiary to perpetrate a fraud. *United States v. Jon–T Chemical, Inc.,* 768 F.2d 686 (5th Cir.1985); *Middendorf v. Fuqua Industries, Inc.,* 623 F.2d 13 (6th Cir. 1980).

Regardless of the rubric under which liability is found (i.e. recognition of corporateness or not), the courts have tended to look for factors denoting the existence of "control," "domination," or "unity of purpose," or subsidiary as a "mere instrumentality." In *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the U.S. Supreme Court held a parent corporation and wholly-owned subsidiary incapable of conspiring with each other for purposes of Section 1 of the Sherman Act due to their "unity of purpose" or "common design." The court stated:

> A parent and its wholly-owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. *Id.* 467 U.S. at 771, 104 S.Ct. at 2741–42.

Although *Copperweld* dealt with the unique issue of whether a parent and its wholly-owned subsidiary could "conspire" with each other for purposes of the Sherman Act, and although those cases which have cited to *Copperweld* are almost exclusively cases involving alleged violations of the Sherman Act,[5] at least one court has

---

**5.** See, *International Distribution Centers, Inc. v. Walsh Trucking,* 812 F.2d § 786 (2d Cir.1987); *Reiter's Beer Dist., Inc. v. Schmidt Brewing Co.,*

657 F.Supp. 136 (E.D.N.Y.1987); *H.R.M., Inc. v. Tele–Communications, Inc.,* 653 F.Supp. 645

applied its principles in a different context. In *SI Handling Systems, Inc. v. Heisley*, 658 F.Supp. 362 (E.D.Pa.1986), the court held that a wholly-owned subsidiary and its parent were essentially the same entity for purposes of ownership of alleged trade secrets, attributing ownership of technology acquired by the wholly-owned subsidiary to the parent, SI.

> Although in *Copperweld* the court was discussing a different issue, the validity of a parent-subsidiary combination as a basis for liability under the antitrust laws, we consider the description quoted above to be equally applicable to the situation which we here confront.... Thus, we do not find it damaging to plaintiff's claim of ownership of the alleged trade secrets, nor even particularly surprising, that there are no agreements between [the wholly-owned subsidiary] and its parent, SI, relating to a transfer of technology to SI since they are essentially one and the same entity. 658 F.Supp. at 370.

The trend, then, under both *Copperweld* and *SI Handling Systems, Inc.*, seems to indicate that courts are becoming more cognizant of the "unity of interest" between a parent and its wholly-owned subsidiary. However, the outcomes of cases necessarily result from the unique fact situations presented, and the focus must, of course, be upon the actual relationship between the parent and subsidiary, tempered by the court's own concept of justice, as was aptly detailed in *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 403–04, 80 S.Ct. 441, 443–44, 4 L.Ed.2d 400 (1960).

> Yet as Mr. Justice Cardozo said in *Berkey v. Third Ave. Railroad Co.*, 244 N.Y. 84, 95, 155 N.E. 58, 61, 50 A.L.R. 599, "Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice." This is not a complete catalogue. The several companies may be represented as one. Apart from that is the question whether in fact the economic enterprise is one, the corporate forms being largely paper arrangements that do not reflect the business realities. *One company may in fact be operated as a division of another*, one may be only a shell, inadequately financed; the affairs of the group may be so intermingled that no distinct corporate lines are maintained. These are some, though by no means all, of the relevant considerations, as the authorities recognize. (Emphasis added).

A court's own inherent notions of justice remain the hallmark of more recent opinions in this area. In *Environmental Protection Dept. v. Ventron Corp.*, 182 N.J. Super. 210, 440 A.2d 455 (N.J.Sup.1981), the court found a parent, Velsicol, liable for the consequences of pollution caused by its wholly-owned subsidiary, WRCC, where "[e]ven if Velsicol had not, in fact, dominated the affairs of WRCC (and it did), it had the ability through its 100% stock ownership to control those acts of WRCC which might affect the public and the environment." 440 A.2d at 462. Despite lack of either inadequate capitalization or substantially exclusive business with the parent corporation, Velsicol, the court pierced the corporate veil of WRCC because "the separate corporate form ... unless pierced, might be a shield behind which Velsicol would be immune from liability for operations *which it substantially controlled and from which it exclusively profited*, resulting in massive mercury pollution to the public detriment and peril." 440 A.2d at 463. (Emphasis added.)

Recent cases involving the specific relationship between Coast and Coleman have resulted in disparate results. In *Ogg v. City of Springfield*, 121 Ill.App.3d 25, 76 Ill.Dec. 531, 458 N.E.2d 1331 (Ill.App.1984), Coleman was held liable for an electrocution accident involving a Hobie Cat and a low-hanging power line under strict liability theory. The jury found Coleman, as the parent, liable due to the control it exercised over Coast and the economic benefit it re-

(D.Colo.1987); *Gucci v. Gucci Shops, Inc.*, 651     F.Supp. 194 (S.D.N.Y.1986).

ceived from the manufacture of the Hobie Cat.

A parent company which participates in the manufacture, marketing and distribution of an unsafe product or which derives economic benefit from placing it in the stream of commerce or which is in a position to eliminate the unsafe character of the product is liable for the loss caused by the product.... The jury in the present case heard testimony that in 1976 Coleman acquired all of Coast's stock and installed one of its own officers as chairman of the board and president of Coast. Coleman then instituted a policy requiring product development committee meetings every month at Coast. The committee was responsible for all design changes and Coast's existing products, including the Hobie Cat 16. Chief executive officers from Coleman received copies of the committee's minutes and attended several of the meetings. In addition, the Hobie Cat 16 instruction and assembly manual, issued in 1978, the year of the accident, stated that Hobie Cat was a Coleman Company product. After hearing the above evidence, the jury found Coleman liable for the injuries caused by the accident. Because Coleman exercised some control over the design of the Hobie Cat, was identified in some Hobie Cat literature and received economic benefit from the same of the boat, such facts proved a sufficient basis for the jury's findings. 76 Ill.Dec. 536, 458 N.E.2d at 1336.

Conversely, in *Hassinger v. Tideland Electrical Membership Corp.*, 622 F.Supp. 146 (D.C.N.C.1985), the court found Coleman not liable for any damage caused by the Hobie Cat sailboat, as the "evidence [did] not show complete domination and control by Coleman at the time the Hassinger Hobie Cat was designed, manufactured and sold. Coleman does not so dominate the finances, policies and practices of Coast Catamaran that Coast has no separate mind, will or existence of its own." 622 F.Supp. at 151. The *Hassinger* court noted that North Carolina law required that Coleman would only be held liable provided Coast's corporate entity was a "mere shell, device or puppet of the shareholder or shareholders." 622 F.Supp. at 150.

In view of these holdings, there appears to be no infallible measuring stick from which parent liability for torts of their wholly-owned subsidiary can be determined —even in the specific Coleman/Coast context, although in the instant case the Illinois tests appear to be more appropriate than the unduly restrictive North Carolina tests. Accordingly, I would accord a jury verdict on the issue of whether Coleman exercised such control over Coast as was necessary to activate agency concepts the substantial deference we normally accord any jury verdict. That is, all reasonable inferences would be drawn in favor of the verdict and the verdict would not be disturbed unless the evidence and inferences are so clear that reasonable minds could not differ on them. *Quincy v. Joint School Dist. No. 41, Benewah County*, 102 Idaho 764, 640 P.2d 304 (1981); *Goodwin v. Wulfenstein*, 107 Idaho 492, 690 P.2d 947 (Ct.App.1984).

Here, however, we are presented with a jury verdict which gives us no firm indication of which view was taken on the agency issue. Instead, there are two possible interpretations of the answers to the jury instructions regarding the relationship between Coast and Coleman. One view points first to Instruction No. 13, which reads as follows:

Do you find that Coast Catamaran Corporation and Coleman Company, Inc., under these instructions, are equally at fault by reason of their business relationship which was a proximate cause of the injuries to Michael Ross?

The jury unanimously answered no. Question No. 14 then listed various entities (i.e. Ross, Idaho Power Company, unknown party, Coast and Coleman), with the jury to designate contribution to the cause of the accident by each:

*Question No. 14:* We find the parties contributed to the cause of the accident in the following percentages:

| | |
|---|---|
| a. Michael Ross | 10% |
| b. Idaho Power Company | 75% |

| | |
|---|---|
| c. Unknown or Unnamed party | 0% |
| d. By reason of a "yes" answer to Question No. 13: Coast Catamaran Company, and Coleman Company, Inc. | 0% |
| e. By reason of a "no" answer to Question No. 13: | |
| (1) Coast Catamaran Company | 10% |
| (2) Coleman Company, Inc. | 5% |
| TOTAL | 100% |

. . . . .

*"In answering Question No. 14, use subparagraph "d" if you answered "yes" to Question No. 13; but use subparagraph "e" if you answered "no" to Question No. 13.* (Emphasis supplied.) "In answering Question No. 14, the percentages of causation you find attributable to each party, whether you use subparagraphs a, b, c and d; or you use subparagraphs a, b, c and e; must total 100% for all parties."

One can interpret Instructions 13 and 14, when read together, as denoting a lack of relationship between Coast and Coleman—agency or otherwise—upon which liability might be imputed to Coleman, since the jury answered no to Instruction 13 and, thereby, responded to subsection "e" of Instruction 14. The words "by their business relationship" appear in Instruction 13, and, by their "no" answer, the jury's response could be interpreted to mean that there did not exist a business relationship between Coast and Coleman such as would lead to imputed liability. Further, in Instruction No. 34, the *Seppi v. Betty*, 99 Idaho 186, 579 P.2d 683 (1978) Instruction, the jury was informed that:

"... If you find the plaintiff's negligence equal to or more than the total amount of negligence of either defendant or Idaho Power Company, he will receive nothing from that entity, regardless of the amount of damages you may find that he was sustained. To the extent that you find the plaintiff negligent in an amount less than any of these entities the total amount of damages sustained by him will be reduced by the amount of percentage of negligence you may attribute to him...."

To the extent that the jury's answers can be interpreted as denoting a finding that Coleman and Coast were distinct entities for purposes of imputing liability, the jury's assessment of 10% negligence to plaintiff Ross, 10% to defendant Coast and 5% to defendant Coleman would indicate an intent on the part of the jury that Ross receive nothing from either Coast or Coleman.

Another equally plausible interpretation of the jury answers determines that the jury did in fact make a finding that Coast and Coleman engaged in a "composite business enterprise," which may, or may not, be the kind of interrelationship upon which liability could be imputed. Under this interpretation, the jury finding to Instruction No. 13 is read to be entirely understandable, since the jury had, in fact, found Coast and Coleman "unequally" negligent. Coast Catamaran was found 10% negligent, while Coleman was found 5% negligent. Ten percent and five percent are not "equal" amounts of negligence and, therefore, the jury finding to Question No. 13 was mandated by the jury's own assessments of negligence. This view also notes that an unequal allocation of negligence as between Coast and Coleman is not inconsistent with a finding that the two were involved in a composite business enterprise of the kind which might lead to imputed liability. One participant in a business venture may be more culpable than another.

The view that the jury did, in fact, decide the imputed liability issue also gains credence when Instruction No. 26 is viewed:

You may find Coleman Company liable for a defect in the design of the Hobie 16 sailboat, provided that you find all of the elements of product defect liability or negligence as required by these instructions previously given, were proved by plaintiff, *and* if you find that Coleman Company for a profit or other benefit *participated in a composite business enterprise* with Coast Catamaran Corporation whereby a consumer demand for a product and reliance upon the product was created by Coleman Company which placed a defective product in the stream of commerce. (Emphasis added.)

It can be presumed that, when the jury returned a finding that Coleman was, in

fact, 5% negligent, they did so with knowledge that such a finding could not be made *unless they had already found* Coleman Company engaged in a "composite business enterprise" with Coast Catamaran Corporation, as specified in Instruction No. 26. In short, this view maintains that it was a necessary prerequisite to a finding of any fault on the part of Coleman Corporation that the jury find the existence of a "composite business relationship" as between Coast and Coleman.

As both of the views discussed above are equally plausible, we are left in a position where we simply cannot discern a definitive finding of the jury regarding the relationship between Coast and Coleman and I conclude that this is due to a failure to propound to the jury instructions designed to elicit a clear finding in this regard. While it is the duty of the party asserting the issues (here, plaintiff Ross) to give notice by requesting appropriate jury instructions, I.R.C.P. 51(a)(1); *Joyce Brothers v. Stanfield*, 33 Idaho 68, 189 P. 1104 (1920), I find that here the deficiencies in the instructions are not due to plaintiff's failure to request adequate instructions, but that counsel for defendants was at least equally the cause of the deficient instructions. In fact, it was defense counsel who argued that the issue of imputation of negligence not be included on the special verdict form (plaintiffs having argued for inclusion), stating:

> Well, I'm not going to suggest an instruction [on imputation of negligence] that, in effect, gives away the store and admits an imputation of negligence.... One thing you can obviously do is to leave it the way we've got it, and then, after we get the percentages, get down stream, and then come in and argue what should be done with them.
>
> [Plaintiff's counsel]: Oh, come on we can't argue the jury's verdict after they've given their verdict ... We'd have to know clearly what the jury wanted to do ...
>
> [Defense counsel]: ... Accumulating is something the judges do all the time. They take and add one percentage to another percentage, if they see fit, and

refuse to, if they don't see fit, and you don't ask the poor damn jury to be involved in the process. Accumulating is something that goes on all the time.

In view of the deficiencies and confusion in the jury instructions, I would rule that the case must be remanded for new trial on the issue of liability.

For guidance on retrial, I would agree with counsel for Coleman that the decision, whether to aggregate is for the trial court to make as a matter of law, based upon the evidence of the presence or absence of a composite business enterprise.

Should the trial court desire to submit the issue of the business relationship to the jury for an advisory finding, the issue should be framed more cogently than was done here.

### IV

### THE SANCTIONS

As already mentioned, the trial court granted Ross' motion in limine and entered an order that there be no mention of the settlement between Ross and Idaho Power. The order provided that, should the defense be put in a position where a legitimate mention of the settlement agreement was called for, the defense would have to make an offer of proof, off the record, before the word "settlement" could be mentioned. In view of the lengthy quotations from defense counsel's closing argument which I have already detailed in opening this opinion, I need not look any further to find supporting evidence that the trial court judge did not abuse his discretion by granting sanctions for obvious, egregious and repeated violations of its order on the motion in limine. Defense counsel's remarks, particularly those implying that Idaho Power had "admitted" causation, put counsel for Rossin the untenable position of either ignoring defense counsel's violative remarks or calling them to the attention of the jury one more time, thereby further reinforcing any harmful effect the remarks might have. See, *Rojas v. Lindsey Manufacturing Co.*, 108 Idaho 590, 701 P.2d 210

(1985). Here, counsel for Ross appropriately chose to file a motion for mistrial or, alternatively, for sanctions in the way of attorney fees. I would hold that, had the trial court based its award of attorney fees (which were made pursuant to I.C. § 7–601(5)), solely upon the violation of the motion in limine by defense counsel, the trial court would not have abused its discretion.

However, the trial court obfuscated the issue by also finding that "the defendants made no offers of settlement before, during or after trial, except for the $10,000 offer of judgment and that failure of these defendants to reasonably and in good faith discuss or negotiate settlement constitutes additional grounds for the award of attorney fees and costs." In view of the jury finding that Coast was only 10% negligent, and Coleman only 5% negligent, it cannot reasonably be argued that the defendants did not, at least, have a strong and valid defense upon which they were entitled to justifiably rely. I cannot support an award of sanctions partially premised upon an alleged failure to negotiate and settle in good faith where the facts and ultimate jury findings make it apparent that the defense could reasonably have believed that their case could have been won. The position taken by the defendants in this regard cannot be characterized as frivolous or unreasonable.

One can employ no reasonable method to attempt to ascertain which portion of the $100,000 attorney fee award was appropriately granted for the violation of the order in limine, and which portion was inappropriately granted due to defense counsel's alleged failure to settle in good faith. Such is not the function of an appellate court. Ordinarily, then, we would remand to the original trial court for such apportionment and redetermination of the amount of sanctions. As the trial court judge has since retired, this is not possible. However, I still deem it more appropriate for a trial court judge to render the initial determination as to a sanction amount and, accordingly, I additionally would remand for such purpose. I also note that I.R.C.P. 37(e)

may provide the more appropriate authority under which sanctions may be imposed:

Rule 37(e). General sanctions—failure to comply with any order.—In addition to the sanctions above under this rule for violation of discovery procedures, any court may in its discretion impose sanctions or conditions, or assess attorneys fees, costs or expenses against *a party or his attorney* for failure to obey an order of the court made pursuant to these rules. (Emphasis added).

## V

Finally, a comment upon the majority opinion's analysis. Part II of the majority's opinion is captioned: "The district court's overruling of the jury's verdict." That caption demonstrates the fallacious *circular reasoning* of the opinion. The issue on appeal is *whether* the verdict was for the plaintiff or the defendant. The majority assumes at the outset it was a defense verdict and then takes nineteen pages to explain why the court could not overturn it. It is a gross mischaracterization to assert, as the majority does at page 826, 761 P.2d at page 1178, that the trial court "overruled the jury's verdict." Sometimes circular reasoning is necessary to reach a result?

BISTLINE, Justice, dissenting.

What the trial bench and bar may perceive as a flaw in the Justice Bakes analysis of this complex case is his approach to the issues presented. He deals first with the sanctity of jury verdicts, saying that:

As a preliminary matter, we must consider whether the jury's findings are supported by substantial competent evidence. If they are, then both the trial court and this Court are bound by the jury's verdict. When reviewing a jury verdict the evidence adduced at trial *must be construed in a light favorable to the party who prevailed* in the jury's verdict.

(At 821, 761 P.2d at 1173) (emphasis added). No one, including this writer, will quarrel with that truism, as a general proposition. BUT, in this particular case, the

single biggest and primary issue which was presented to the trial court, and upon which it ruled favorably to the plaintiff, was the impact made upon the jury by defense counsel's final summation where he did not merely mention the Idaho Power settlement, but implied to the jury that it was so substantial that plaintiff's pursuit of Coleman Company and Coast Catamaran was to gain a windfall. If this was improper and inflammatory,[1] and hence prejudicial to the plaintiff in the eyes of the jurors, as the man on the scene, i.e., the trial judge, so concluded, then it behooves an appellate court to examine the jury's findings with somewhat of a jaundiced eye. Justice Bakes, however, has approached the opinion-writing task by first tackling the jury findings, and much later turning to defense counsel's remarks in summation, the essence of which must be found elsewhere than in his opinion. Only in that manner is he able to give great deference to the jury findings.

When Justice Bakes in his opinion finally reaches the issue raised as to imposition of sanctions for the court-found violation the in limine order, he encounters no problem because prior to defense counsel's summation it was "the trial court itself which 'rang the bell' and instructed the jury several times on separate occasions regarding the settlement agreement with Idaho Power." (At 837, 761 P.2d at 1189). Justice Bakes does not favor his readers with the trial court's instructions which did so, and the reader may well wonder if such were of the same ilk as that which defense counsel said to the jury. It would be one thing for a court to simply tell a jury that a given defendant had settled with the plaintiff, but quite another for counsel to tell the jury, as happened in *Rojas v. Lindsay Mfg. Co.*, 108 Idaho 590, 701 P.2d 208 (1985):

> Now, you will be asked on the verdict form whether Mr. Marshall was negligent; and I submit to you that he was negligent. And I submit to you that his, his action was what caused this accident.

Otherwise why would he have settled? I can tell you—and I don't feel real good right now; but it is not very much fun trying lawsuits. It is hard work. And if you can settle, it is a lot easier. But if you think you are right, you have a right to defend yourself.

\* \* \* \* \* \*

Anything can hurt you if used improperly. And we submit that the cause of the accident was the improper use of the machine by Kenneth Marshall; and Kenneth Marshall recognized the use of the machine when he injured Pedro Rojas because he settled this case. He got out. *Rojas, supra,* p. 592, 701 P.2d 208.[2] Where the trial court found in Ross's case the remarks of counsel to be in violation his order, a contrary conclusion should not be so readily forthcoming from appellate judges who were not privy to the scene.

In that regard there is language in Justice Brennan's dissenting opinion in *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) which he borrowed from *People v. Green*, 70 Cal.2d 654, 75 Cal.Rptr. 782, 451 P.2d 422 (Cal.1969) which to any experienced trial lawyer is highly appropriate and must be kept in mind when appellate judges review a cold transcript of trial testimony. Because Justice Mosk, who wrote *People v. Green*, was discussing the use of a preliminary hearing transcript at trial, rather than a live witness (cf. *State v. Elisondo*, 114 Idaho 412, 757 P.2d 675 (1988)), liberty has been taken to paraphrase his eloquence to fit an appeal transcript:

> Lost in a cold reading of the transcript is the more subtle yet undeniable effect of counsel's rhetorical style, his pauses for emphasis and his variations in tone, as well as his personal rapport with the jurors, as he pursues his peroration. Forensic indignation, whether expressed physically or verbally, may produce good results in special circumstances. Coun-

---

1. Justice Huntley's opinion synopsizes the verbatim content of those remarks. (At 841, 761 P.2d at 1193).

2. Justice Bakes acknowledges that the very purpose of the motion for an order in limine was to avoid misuse of the court's advising the jury of a settlement, based on the *Rojas* case.

sel must always temper his summation to the individual jurors, using their reactions as a guide to the most effective line of argument. He will keep in mind that he is a performer and the juries are his audience. No good performer ignores his audience, and all good performances are conducted for the purpose of favorably impressing the audience.

Having concurred in Justice Huntley's dissenting opinion, I am also in agreement with Justice Bakes that the award of attorneys fees cannot stand by reason of its having been in part based on the defendant's failure to conduct settlement negotiations in good faith. In that regard the trial court should have felt itself bound by our holding in *Payne v. Foley,* 102 Idaho 760, 639 P.2d 1126 (1982). Additionally, as to *Odenwalt v. Zaring,* 102 Idaho 1, 624 P.2d 383 (1980), although Justice Huntley has taken note of my dissent in that case, note is also to be taken that Justice McFadden joined that dissent. Had Justice Huntley been on the Court at that time, and entertained the same view of *Odenwalt* as now, the *Odenwalt* mistake would not have happened.